## RANDOLPH HILLS, INC. *v.* MONTGOMERY COUNTY COUNCIL

[No. 136, September Term, 1971.]

*Decided January 11, 1972.*

The cause was argued before HAMMOND, C. J., and McWILLIAMS, FINAN, SINGLEY and DIGGES, JJ.

*Hal I. Lackey,* with whom were *Hal Lackey* and *Garland E. Lowe* on the brief, for appellant.

*John B. Walsh, Jr., Assistant County Attorney,* with whom were *Richard S. McKernon, Acting County Attorney, Alfred H. Carter, Deputy County Attorney,* and *Philip J. Tierney, Assistant County Attorney,* on the brief, for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

Appellant (RHI) sought to have 4.96± acres (the property) of R-60 land reclassified to I-1.[1] The gist of its complaint is that the property has no reasonable or beneficial use in its present classification, that it can be used only for outdoor storage, a use permitted in the I-1 zone, and that denial of this use is arbitrary, capricious, unreasonable and confiscatory. The Technical Staff of the Montgomery Planning Board recommended denial. The Planning Board adopted the report of the Technical Staff and recommended to the County Council, sitting as the District Council, that the application be denied. On 7 July 1970 the Council denied the application. On 6 May 1971 Judge Mathias affirmed the action of the Council and a judgment for costs was entered in favor of the ap-

---

1. The R-60 classification permits one-family detached dwellings on lots having an area of not less than 6000 square feet, not more than 35% of which may be covered by buildings.

The I-1 classification permits a number of light industrial uses.

pellee. RHI, understandably miffed, has looked to us to turn the tables. We shall leave things as they are.

In 1952 RHI acquired a 380 acre tract of land wedged between the Baltimore and Ohio Railroad and Rock Creek Park. The Town of Garrett Park lies to the southwest on the other side of the railroad and Rockville is a few miles to the northwest. At the time the tract was designated Residential "A" but in 1954 it was placed in the R-60 classification. The development of the tract, now known as Randolph Hills, was begun in 1953. By 1958 all of the land (except about 17 acres reclassified from R-60 to I-1) had been subdivided, houses had been built on all of the lots, and all of the lots had been sold. Saul Perlmutter, the vice president of RHI, testified that the tract had been developed in accordance with the wishes and under the control of the officers of RHI. The property abuts the railroad right-of-way for a distance of 1,900 feet. The northernmost 1,600 feet is between 50 and 100 feet wide. The remaining 300 feet is from 100 to 300 feet wide. The property also abuts the rear lines of 31 lots fronting on Schuylkill Road and Ashley Drive, both of which are generally parallel to the railroad. The northern end abuts the 17 acre I-1 parcel, also owned by RHI and apparently fully developed. The southern end abuts land owned by another.

The District Council, in its opinion, referred to RHI's 1969 petition for a special exception to permit the "off-street parking of motor vehicles in connection with the industrial complex on the I-1 zoned land to the north." The Council noted the denial of the 1969 petition by the County Board of Appeals and the affirmance of the Board's decision by the circuit court, from which no appeal was taken. The District Council went on to say:

> "We agree with the decision of the Circuit Court that *any hardship involved in this case was created by the applicant when it designed and constructed the Randolph Hills Subdivision in such a manner so as not to include the subject*

*property in the subdivision.* There is no merit to the applicant's contention that the subject property was created as a result of the operation of the provision of the Subdivision Regulations which require a residential street paralleling a railroad to be at a distance from the tracks sufficient to provide lots with a minimum of 160 feet depth backing to the railroad right-of-way. This provision was not added to the Subdivision Regulations until October of 1961 almost 3 years after the Randolph Hills Subdivision had been completed. In any event, *there is no reason why the applicant could not have developed larger lots backing onto the railroad right-of-way than those in the remainder of the subdivision and sold them for a higher price.* We are of the opinion that the instant case falls squarely within the rule enunciated by the Court of Appeals in the case of *Montgomery County Council v. Kacur,* 253 Md. 220, 231 (1969) that, '* * * a property owner may not require the Council to grant a rezoning, through the due process clauses of the State and Federal Constitutions, by creating a hardship situation of his own making in which he cannot but lose money.' " (Emphases added.)

Judge Mathias, at the conclusion of the hearing before him on 6 May 1971, delivered his opinion orally from the bench. Excerpts from that opinion follow:

"This large tract has since been developed by the applicant as a subdivision of homes known as Randolph Hills.

*"For engineering reasons, economic reasons, or for some other reason the applicant, in laying out the subdivision, left as an outlot the particular ground which is the subject of this rezoning application.*

"As already noted, the tract abuts Randolph

Hills single family residences on the east and on the west, the B & O Railroad right-of-way, which lies between the tract in question and the Garrett Park subdivision of private homes on the west.

"There has never been any restriction in the zoning ordinance that would have prevented the applicant from using the ground in question for R-60 residences.

*"Its use for R-60 residences is precluded at this time because the applicant chose to lay out its subdivision in the particular manner that it did.*

"Whether the applicant thought that it was economically prudent to reserve this outlot for possible future development as commercial or industrial ground we do not know, nor is it important. *What is important is that the use of the particular ground in question is restricted because the applicant chose to develop as it did."*

\* \* \*

"It is our further view that even if it were true that the property in question could not be used for any purpose at all under R-60 zoning, the applicant would still not be entitled to prevail, *because this alleged hardship was self-inflicted by the applicant.*

"The applicant has said, in effect, that although it was entitled to use this ground in question under the zoning code for R-60 development *it chose not to do so, it now wants the County to permit the use of this land for some other purpose.*

"We think that the applicant is not entitled to such relief under the doctrine set out in *Salisbury Board of Zoning Appeals v. Bounds,* 240 Md. 547 (1965)." (Emphases added.)

We think Judge Mathias was right in relying on *Salisbury.* In that case we quoted with approval an excerpt

from 2 Rathkopf, *The Law of Zoning and Planning,* 48-1. The quotation, in part, is as follows:

" 'If the peculiar circumstances which render the property incapable of being used in accordance with the restrictions contained in the ordinance have been themselves caused or created by the property owner or his predecessor in title, the essential basis of a variance, i.e., that the hardship be caused *solely* through the manner of operation of the ordinance upon the particular property, is lacking. In such case, a variance will not be granted; the hardship, arising as a result of the act of the owner or his predecessor will be regarded as having been self-created, barring relief.' " 240 Md. at 554.

Judge Marbury, who delivered the opinion of the Court in *Salisbury,* said, after quoting from Rathkopf:

"The instant case fits squarely within the above general rule. The construction of the fourth apartment and the resultant hardship could have been avoided if the appellees had used proper diligence in ascertaining what the density requirements were for a four apartment dwelling within the district in which this property is located, and then made accurate measurements to see if this particular property met the square footage requirements. *The hardship here relied on was entirely self-created and the Board properly refused to allow it to be used as a fulcrum to lift, by way of a variance, the valid limitations imposed by the Salisbury Zoning Code.*" 240 Md. at 555. (Emphasis added.)

To the same general effect *see Montgomery County Council v. Kacur,* 253 Md. 220, 231 (1969), and the cases there cited.

It seems to us difficult, and perhaps impossible, to suppress the notion that RHI has already made good use of

the property. Admittedly it served a useful purpose during the construction of the houses along Schuylkill Road and Ashley Drive and it seems reasonable to suppose that by locating those streets further away from the railroad the lots fronting thereon acquired extra value. In this regard Perlmutter said they "were a little concerned * * * because of the closeness of the railroad" and that they "wanted to keep away from the railroad a little further." Then, too, there is testimony suggesting that RHI used the property as a sort of carrot to dangle before prospects contemplating the purchase of one or more of the 31 abutting lots. Oscar W. Lease bought one of these lots in September 1968. He said he questioned the saleslady about the property. She told him it was not being developed because the "exact boundary of the railroad" was in question. She also told him that "within the year the developer * * * [would] build an eight foot fence" to protect children. Finally she assured him that "there was not enough land there for anything ever to be built on [it]."

Despite the useful purpose already served it occurs to us that the property is not wholly without present value. There was, to be sure, evidence that under the R-60 classification farming and the sale of Christmas trees are permitted uses, and while we would have to agree that they are possible uses we hesitate to say whether the one or the other would be, in the circumstances, a reasonable or beneficial use. Not that it matters because there is language in the opinion of the Council which suggests that this property could be sold to the abutting lot owners and this strikes us as a feasible, albeit less profitable, approach to the problem of converting it into dollars. Mr. Lease testified also that there came a time when he "inquired if this [the property] could possibly be purchased." An RHI agent told him he could have it for $0.25 per square foot. Lease thought this "a little bit ridiculous" in light of the fact that he had paid only a little more than $0.08 per square foot for his own lot.

Nothing more than simple arithmetic is required to show that RHI's notion of the present value of the property is in the neighborhood of $10,000 per acre. Even at $0.08 per square foot a value of more than $2,500 per acre is indicated and quite likely Lease and a good many of his neighbors would think it worthwhile to spend that much to enlarge their lots. So RHI may still have its cake and eat it as well but it ought not complain because the cake has become a little stale. However, it should not be supposed that we might have taken a different view of this case had the property been shown to be utterly worthless. *Kacur, supra* and *Salisbury, supra*.

> *Judgment affirmed.*
> *Costs to be paid by the appellant.*