933 A.2d 475

William F. CHESLEY, et ux.

v.

CITY OF ANNAPOLIS, Maryland.

No. 1104, Sept. Term, 2006.

Court of Special Appeals of Maryland.

Sept. 27, 2007.

414

Sager A. Williams, Jr. (Blumenthal, Delavan & Williams, PA on the brief), Annapolis, for appellant.

Jonathan P. Kagan (Brassell, Baldwin, Kagan & May, PA., Shaem Spencer, City Attorney on the brief), Annapolis, for appellee.

Argued before DAVIS, JAMES R. EYLER, and ADKINS, JJ.

ADKINS, J.

William and Robin Chesley, appellants, challenge the denial of a front yard setback variance that would enable them to build a one car garage within three feet of the street along their Chesapeake Bay waterfront property in Annapolis. They present two questions for our review:

I. Did the Board of Appeals err in denying the Chesleys' zoning variance because the Board's conclusions are not supported by substantial evidence and because the Board failed to apply the law correctly?

II. When the City appears as a party at a public hearing before the Board of Appeals through officials who work for the City's Planning Department, and when those City officials testify in favor of a variance application, is it improper for the City in a subsequent petition for judicial review of the Board's decision to oppose the variance by taking positions contrary to the positions City officials took before the Board?

Finding no error, substantial evidence in the administrative record to support the Board's denial of this variance, and no impropriety in the City's advocacy, we shall affirm the judgment.

## City Regulations

The Annapolis City Code sets minimum setbacks of six feet for side yards and 30 feet for front yards for accessory structures in an R2 zone, such as the Chesleys' proposed garage. *See* Annapolis City Code § 21.18.040(C)(hereafter cited as "Code"). The Chesley property is subject to other building restrictions, however, due to its location at 15 Eastern Avenue in the Eastport section of Annapolis, on the Chesapeake Bay.

First, the approximately one-third acre lot is in the Chesapeake Bay Critical Area, and therefore all buildings on this lot must be set back at least 44 feet from the shoreline. Impervious surfaces may not cover more than fifty percent of the lot. As a result, the residence, driveway, and accessory structures

may not occupy more than approximately 7,870 square feet of the Chesley property.

Second, the Chesley property lies in a Residential Conservation Overlay District, which requires formal Site Design Plan Review by the City's Department of Planning and Zoning prior to issuance of all building permits for any construction that impacts the street facade. *See* Code § 29.69.030. The purpose of this regulation

> is to preserve patterns of design and development in residential neighborhoods characterized by a diversity of styles and to ensure the preservation of a diversity of land uses, together with the protection of buildings, structures or areas the destruction or alteration of which would disrupt the existing scale and architectural character of the neighborhood. The general purpose includes . . . . [c]ompatibility of new construction . . . with the existing scale and character of surrounding properties[.]

Code § 21.69.010. The RC overlay standards encourage traditional urban design, *inter alia,* by permitting reduced building setbacks to the extent that the proposed new construction maintains building patterns of the neighborhood. *See* City of Annapolis Dep't of Planning and Zoning, *The Eastport Residential Conservation Overlay District: A Guide to the Process and Design Guidelines* 2.

The third and final factor affecting use of the property is that the Chesley lot lies within the Eastport Residential Conservation Overlay District. *See id.* Eastport originated in the late 19th century, and remained an independent town until the City of Annapolis (the City) annexed it in 1951. *See id.* at 8. The neighborhood is located within walking distance to downtown Annapolis and the City Dock, on the Horn Point peninsula, between Spa Creek and Back Creek, where the Severn River enters the Chesapeake Bay. *See id.* Eastport homes reflect that community's working-class and maritime roots, characterized architecturally by "social and physical diversity, together with its small, intimate scale" and an ambiance described as "[d]elicate, unique, special, charming,

historic, quiet, [and] personal[.]" *See id.* To preserve that character, "all new construction, including . . . accessory structures which may be visible from the street [must] be reviewed for compliance with the guidelines in Section 21.98.050.D[.]" *Id.* With respect to building setbacks from the street, these must "observe the established setbacks for the block on which [the construction] is proposed, or the setback requirement of the underlying zone, whichever is less[.]" *Id.* at 4.

The Annapolis City Code permits the Board to grant a variance from applicable setback requirements, *see* Code § 21.28.040.A, upon finding that the following conditions have been satisfied:

1. Because of the particular physical surroundings, shape or topographical conditions of the specific property involved, a **particular hardship to the owner would result as distinguished from a mere inconvenience** if the strict letter of the regulations were to be carried out;

2. The conditions upon which a petition for a variation is based are unique to the property for which the variance is sought, and are not applicable, generally, to other property within the same zoning classification;

3. The purpose of the variance is not based exclusively upon a desire to increase financial gain;

4. The alleged **difficulty or hardship is caused by this title and has not been created by any persons presently having an interest in the property;**

5. The granting of the variation will not be detrimental to the public welfare or **injurious to other property or improvements in the neighborhood in which the property is located;**

6. The proposed variation will not impair an adequate supply of light and air to adjacent property, or substantially increase the congestion of the public streets, or increase the danger of fire, or endanger the public safety, or **substantially diminish or impair property values with [sic] the neighborhood.**

Former Code § 21.80.030(A)(1996)(emphasis added). *See also* Code § 21.28.050 (2005)(current variance standards and conditions are substantially the same).

## The Chesleys' Development Proposals

Immediately after purchasing the property in 2000, the Chesleys consulted with the City's Department of Planning and Zoning regarding their wish to replace the existing residence with new construction, including a house with attached two car garage and a pool. As a result of negotiations over 18 months, during which the Department of Planning and Zoning (the Department) pressed for a public view corridor along the southern boundary of the property and design changes to make the new home "more Eastport-like," the Chesleys amended their plans to propose a detached two car garage.[1] The Department noted that this would require side and front yard setback variances, but told the Chesleys that the Department would "support" the request. *See* Code § 21.28.020.B (planning staff reviews variance applications and makes reports and recommendations to the Board).

In support of their garage variance, the Chesleys advised that when Mr. Chesley's wheelchair-bound adult son Billy visits, he uses a special van with a metal lift and ramp that becomes slippery in rain, snow, or ice. In addition, waterfront lot owners along Eastern Avenue treat their front yards as their rear yards for purposes of garages. The Chesleys contend that "[n]o waterfront property along Eastern Avenue has its water view blocked by a detached garage built between the home and the water." Moreover, the lots on each side of the Chesleys have detached garages within a few feet of the street.

---

1. The Planning Department advised that these two goals could be met, *inter alia*, by detaching the garage and locating it in the front yard next to the detached garage located on the Russell property next door. The Planning Director characterized this area of the Chesley property as a "dead zone" where a detached garage would not adversely impact the neighbors or streetscape. In addition, planning authorities advised that construction in this location would add an "inexact" symmetry consistent with Eastport's eclectic character.

The City approved plans for a new 5,000 sq. ft. residence, but concluded that further review of the pool and garage proposals was necessary. In addition to those exclusions, the City's approval was subject to specific conditions. One condition was that the Chesleys enter into a "View Cone Covenant and Agreement"[2] with two neighbors across the street, in order to preserve a public view to the Chesapeake Bay. They did so. These two agreements prohibit development of an 18–20 foot wide strip along the westerly side of the lot. According to Mr. Chesley, his is the only lot that the City has required a recorded view cone agreement as a condition of approval.

The Chesleys proceeded to build their house as approved by the City, *i.e.*, without a garage. During construction, they petitioned for approval of a variance that would allow them to build a one story, two car, detached garage, within three feet of Eastern Avenue, in the location suggested by planning authorities. As promised, the Planning Department submitted a staff report supporting this request. After a public hearing, at which neighbors opposed the Chesleys' proposal, the Board unanimously denied the application on July 17, 2002.

The Chesleys completed construction of both the house and the pool, then occupied their home for the next 18 months, during which time they had a daughter.[3] In 2005, the Chesleys filed a second application for a variance, this time to build a scaled-back one story, one car garage in the same location, also requiring a variance to allow a three foot setback, but no side setback variance. The garage would be custom-designed to accommodate the van used to transport Billy. The Department again supported the variance application.

---

**2.** A "view cone" is "a space defined by two projected lines from the centerline of a street right-of-way that is to be kept free of obstructions so as to preserve a distant view." Code § 21.72.010.

**3.** After the Chesleys petitioned for judicial review in 2005, Mrs. Chesley's mother moved into the home for health reasons. She resides there full-time.

At a June 7, 2005 hearing, counsel for the Chesleys proffered the testimonies and qualifications of an architect and a land planner, as well as Mr. Chesley's testimony.[4] Two neighbors then testified for, and two against, the proposal.

On June 29, after public deliberation, the Board issued a written 2–1 decision denying the variance. A majority of the Board quorum[5] concluded that the Chesleys failed to satisfy the six required conditions for a setback variance. Specifically, the Board found that no hardship exists, that the claimed hardship was self-created, and that the proposed garage would have a negative impact on the neighborhood.

The Chesleys petitioned for judicial review in the Circuit Court for Anne Arundel County. The City Attorney, acting as counsel for the Board, gave notice of the Board's intent to participate. Later, outside counsel appeared on behalf of the City. The circuit court affirmed the Board's decision, and the Chesleys filed this timely appeal.

## DISCUSSION

### I.

### Setback Variances

A variance authorizes the property owner " 'to use his property in a manner forbidden' " by applicable zoning restrictions. *See Cromwell v. Ward,* 102 Md.App. 691, 700, 651 A.2d 424 (1995) (citation omitted). In contrast to special exceptions, which " 'contemplate[] a permitted use ... [once] the prescribed conditions therefor are met[,]' " a variance

---

**4.** Consideration of the Chesley variance application began at 12:30 a.m. on June 8. Responding to the perception that the Board wanted a short hearing, counsel for the Chesleys submitted most of their evidence in documentary form and by proffer.

**5.** The Board has five members. Four were present for the 2005 hearing, two of those having voted to deny the Chesleys' 2002 variance application. Three of the members present at the 2005 hearing, including both who were on the Board in 2002, participated in the deliberations and decision in 2005. Two of those members voted to deny the application, while one of the 2002 Board members voted to grant it.

" 'contemplates a departure from the terms of the [zoning] ordinance in order to preclude confiscation of the property[.]' " *Id.* at 699–700, 651 A.2d 424 (citation omitted). Although "the purpose of a variance is to protect the landowner's rights from the unconstitutional application of zoning law[,]" variances are frequently permitted in circumstances when application of the setback requirement would not constitute a "taking." *See Belvoir Farms Homeowners Ass'n, Inc. v. North,* 355 Md. 259, 281, 734 A.2d 227 (1999).

There are different types of variances, including the "ordinary" front yard setback variance at issue here and the variances from the setbacks established by statute for critical areas in an effort to regulate development of waterfront properties. Not surprisingly then, "there are different criteria that must be met for 'ordinary' or 'general' zoning variances and critical area variances." *Becker v. Anne Arundel County,* 174 Md.App. 114, 139, 920 A.2d 1118 (2007). The criteria for a yard setback variance are established by the City, as set forth above.

## The Board's Findings

During deliberations, the two Board members in the majority articulated what amounts to a *"caveat* builder" perspective concerning the Chesleys' predicament. In their view, because the Chesleys knew that they would need a front yard setback variance to build a detached garage in the location recommended by planning authorities, they should have either (a) waited to construct their home and pool until they obtained a variance for the garage, or (b) "redesigned [the house] in a way that they wouldn't have this problem." Referring to how the footprint of the house sits on the lot, the other Board member in the majority observed that the Chesleys could have addressed concerns about the 30 foot setback by "modif[ying] the size of the home to allow for a detached garage next to it from the opposite [side] from the view cone and they could have changed the configuration in the house."

In its written opinion, the Board concluded that the Chesleys did not satisfy the threshold requirement in the Code that there be a hardship resulting from "the particular physical

surroundings, shape or topographical conditions." Concern regarding the large size of the house in relation to the lot is evident in the Board's findings:

Through Site Design Plan Review, the applicant established a view cone covenant along the southwestern end of the property in order to preserve the views, from the public right of way, out to the Chesapeake Bay. **The Board finds as it did once before that despite the view cone restriction, there was adequate room on the property to construct a reasonable size residence with a detached or an attached garage without the need for the requested variance. The applicant chose to construct a larger home, and then request a variance rather than plan for a home when it had the space and ability to construct the garage within existing restrictions.** Accordingly, the Board again finds that no hardship exists. (Emphasis added.)

With respect to the second requirement that "[t]he conditions upon which a petition for a variation is based are unique to the property[,]" the Board found "that the typical constraints of waterfront development within the critical area and the view cone covenant do not in and of themselves necessitate the requested variance."

With respect to the fourth condition that "[t]he alleged difficulty or hardship is caused by this title and has not been created by" the Chesleys, the Board ruled:

Although a view cone covenant was supported by Planning and Zoning prior to the site design approval for the new residence, the applicant consented to the covenant as part of the overall redevelopment of the property and could have planned for the redevelopment with a garage and the viewcone. The Board finds that the claimed hardship has been created by the applicant.

Finally, with respect to the fifth and sixth requirements that the variance "will not," *inter alia,* be "injurious to other property ... in the neighborhood[,]" or "substantially diminish or impair property values with[in] the neighborhood," the Board concluded:

Testimony was presented at the hearing about the location of the garage on that side of Eastern Avenue. Concerns were raised about the negative impact on the streetscape. **The Board finds that adding a garage at this location will contribute to the walling off of that side of Eastern Avenue with structures and create a visually unattractive streetscape.** The Board finds that this would substantially diminish or impair property values in the neighborhood. (Emphasis added.)

The circuit court ruled that the Chesleys cannot challenge the Board's 2005 findings that the Chesleys did not suffer hardship and that any hardship they claim to have suffered was self-created, because they did not challenge the Board's 2002 finding on the same questions by seeking judicial review of that decision.[6]

## The Chesley Challenges

The Chesleys contend that "[t]he Board premised its negative findings on a misunderstanding of Maryland law applicable to the variance concepts of 'hardship' and 'self-created hardship.'" With respect to neighborhood impact, the Chesleys assert that the Board's negative findings are arbitrary and capricious because they are not based on any empirical data or other competent evidence that refute the undisputed evidence provided by the Chesleys' expert witnesses and the City's professional planners. The City contends that the Board's decision is legally correct and supported by the record.[7]

---

6. In its 2002 decision, the Board found that,

 despite the cone view restriction, there was adequate room on the property to plan for and construct a reasonable size residence with a detached or attached garage without the need for the requested variance. The applicant chose to construct a larger home and then request this variance to build the garage in the requested location, rather than plan to construct the garage within the existing restrictions.

7. The City also argues that the Chesleys are collaterally estopped from challenging the Board's hardship findings, because they did not seek

## Satisfying Conditions For Variance

■ "The burden of showing facts to justify ... [a] variance rests upon the applicant[.]" *Easter v. Mayor of Baltimore*,

---

review of the Board's substantially similar hardship findings in 2002. "Under settled Maryland law, appellate review of administrative decisions is limited to those issues and concerns raised before the administrative agency." *Capital Commercial Props., Inc. v. Montgomery County Planning Bd.*, 158 Md.App. 88, 96, 854 A.2d 283 (2004). A court "may not uphold the agency order unless it is sustainable on the agency's findings and for the reasons stated by the agency." *Eastern Outdoor Adver. Co. v. Mayor of Baltimore*, 128 Md.App. 494, 516, 739 A.2d 854 (1999)(emphasis and citation omitted), *cert. denied*, 358 Md. 163, 747 A.2d 644 (2000). Moreover, "[i]t is the function of the reviewing court to review only the materials that were in the record before the agency at the time it made its final decision." *Dep't of Labor v. Boardley*, 164 Md.App. 404, 415 (2005). For these reasons, "[w]e do not allow issues to be raised for the first time in actions for judicial review of administrative agency orders[.]" *Delmarva Power & Light Co. v. Public Serv. Comm'n of Md.*, 370 Md. 1, 32, 803 A.2d 460, *motion for reconsideration granted on other grounds*, 371 Md. 356, 809 A.2d 640 (2002). *See, e.g., Cicala v. Disability Review Bd. for Prince George's County*, 288 Md. 254, 261–63, 418 A.2d 205 (1980) (failure to argue at administrative hearing that the board did not have a report that it was required to obtain and consider prevented consideration of that issue on judicial review); *Swoboda v. Wilder*, 173 Md.App. 615, 641, 920 A.2d 518 (2007)(opponents of proposed building permit waived objection to zoning board's consideration of expert testimony by failing to object at administrative hearing); *Cremins v. County Com'rs of Washington County*, 164 Md. App. 426, 445, 883 A.2d 966 (2005) (property owners waived argument that unsworn testimony before zoning authority should not be considered by failing to object at administrative hearing); *Capital Commercial Props.*, 158 Md.App. at 102, 854 A.2d 283 (declining to consider whether board's decision complied with certain statutory requirements because that issue was not presented to the board). A contrary rule "would allow the courts to resolve matters *ab initio* that have been committed to the jurisdiction and expertise of the agency." *Delmarva Power & Light*, 370 Md. at 32, 803 A.2d 460.

Here, the issue of whether the Chesleys were collaterally estopped in 2005 as a result of the Board's hardship finding in 2002 was not preserved for judicial review, because (1) the City did not argue collateral estoppel to the Board; (2) the administrative record does not include the 2002 records necessary to determine whether collateral estoppel is warranted; (3) the Board did not conduct the requisite inquiry into whether the proceedings on the 2002 variance "embraced elements of adjudicatory procedure consistent with established principles of due process," *see Batson v. Shiflett*, 325 Md. 684, 705, 602 A.2d 1191 (1992) (citation omitted); and (4) the Board did not rest its decision to deny the variance on principles of collateral estoppel.

195 Md. 395, 400, 73 A.2d 491 (1950). In cases involving critical area variances, it has been made clear by statute that applicants "have the burden of meeting all of the requirements" enumerated in the law governing such variances. *See* Md.Code (1973, 2000 Repl.Vol., 2006 Cum.Supp.), § 8–1808(d)(4)(ii) of the Natural Resources Article (NR)(to obtain a critical area variance, applicant must satisfy each one of the statutory conditions); *Becker,* 174 Md.App. at 130–32, 920 A.2d 1118 (reviewing legislative history of criteria for critical area variances, including recent change requiring satisfaction of all statutory conditions). Whether the applicant must satisfy all of the City's enumerated conditions for an "ordinary" front yard setback variance is less clear.

In a line of critical area variance cases that prompted legislative action, the Court of Appeals held that the "determinative factor" in granting a variance was whether there is hardship, so that all other conditions for the grant of such a variance were construed as merely providing guidance and could not be individually cited as grounds to deny the variance. In *White v. North,* 356 Md. 31, 50, 736 A.2d 1072 (1999), the Court explained, using language that is arguably broad enough to encompass all types of variances, that the dispositive question is whether denial of the requested variance will create hardship:

The variance provisions of the ordinance at issue include, as do most such ordinances, a list of other factors that must be considered with respect to the grant or denial of a variance. They are described as (1) a deprivation of rights commonly enjoyed by others; (2) that no special privilege will be conferred on an applicant; (3) that the need for relief not be caused by an applicant's own acts; (4) the need for a variance does not arise from conditions on adjacent property; (5) a variance will not adversely affect water quality, fish, wildlife, or plant habitat; (6) a variance will be in harmony with the general spirit of the particular zoning regulation; (7) that the variance is the minimal necessary to afford relief; (8) the variance will not alter the essential character of a neighborhood; (9) the variance will not

impair an appropriate use of adjacent property; (10) the variance will not counter acceptable clearing and replanting requirements; and (11) the variance will not be detrimental to the public welfare. If total compliance with every specific requirement were necessary, relief would be nearly impossible and serious "taking" questions might arise. It is our view that these specifically stated requirements are to be considered in the context of the entire variance ordinance, to the end that, when interpreted as a whole, either they are or are not *generally* met.

Moreover, the essential determination is whether an unwarranted hardship exists. The specific factors that must be considered cannot be construed individually to overrule a finding of unwarranted hardship any more than they could overrule a finding of an unconstitutional taking of one's property. The individual provisions that must be considered are part of the entire matrix that defines what information is necessary to reach a finding as to the existence or nonexistence of an unwarranted hardship.

*White,* 356 Md. at 50–51, 736 A.2d 1072. *See also Lewis v. Dep't of Natural Resources,* 377 Md. 382, 413, 833 A.2d 563 (2003)("We have recently held, in *White,* that these criteria must be applied in total and generally, and that no individual factor is to be determinative").

In response to *White,* the 2002 General Assembly amended the critical area law to explicitly require compliance with all the variance conditions set by statute. *See* 2002 Md. Laws, ch. 431, 432; *Becker,* 174 Md.App. at 131–33, 920 A.2d 1118. There is no analogous certainty in cases involving other types of variances. Unlike the revised critical area statute, the City's zoning code does not specifically address whether all the enumerated variance conditions must be satisfied. Nor have we been cited to a case affirming the denial of a variance for a single reason unrelated to hardship. *Cf. Stansbury v. Jones,* 372 Md. 172, 204, 812 A.2d 312 (2002)(declining to decide "whether self-created hardship alone is sufficient to deny an area variance[,]" while noting that Court of Appeals has

"assumed, without any extensive investigation of the matter, that it was sufficient").

Here, the City did not argue to either the Board or this Court that the denial of the Chesleys' variance application should be affirmed on the basis of non-hardship factors. Nor did the Board rest its decision solely on a negative finding regarding a single factor. For that reason, we shall address whether the Board erred in determining both that the Chesleys failed to establish a hardship that was not self-created and that the proposed garage would have a negative impact on the neighborhood.

### Appellate Review Of The Board's Decision

The standard governing appellate review of variance decisions is "the same whether the agency grants or denies" the application. *See Stansbury,* 372 Md. at 185, 812 A.2d 312. "Our role in reviewing whether the Board, as an administrative agency, correctly reached the conclusions required by the Zoning Ordinance for ... a variance ... 'is precisely the same as that of the circuit court.' This means we must review the administrative decision itself." *Mastandrea v. North,* 361 Md. 107, 133, 760 A.2d 677 (2000) (citation omitted). Thus, we repeat the task performed by the circuit court. *See Red Roof Inns, Inc. v. People's Counsel for Baltimore County,* 96 Md.App. 219, 224, 624 A.2d 1281 (1993).

Because we review the Board decision, rather than the circuit court decision, our focus is on the reasons given by the Board. *See Gigeous v. Eastern Corr. Inst.,* 363 Md. 481, 495–96, 769 A.2d 912 (2001). Consequently, this Court may consider any ground cited by the Board for its decision, even if the circuit court did not reach that issue in affirming the Board. *See, e.g., Md.-Nat'l Capital Park and Planning Comm'n v. Friendship Heights,* 57 Md.App. 69, 83, 468 A.2d 1353 (reviewing issue of whether there was substantial evidence to support zoning agency's decision, after ruling that circuit court erred in deciding that it lacked jurisdiction to entertain the action for judicial review), *cert. denied,* 300 Md.

89, 475 A.2d 1200 (1984); *Wheaton Moose Lodge No. 1775 v. Montgomery County*, 41 Md.App. 401, 417–18, 397 A.2d 250 (1979)(fact that circuit court affirmed zoning board's denial of rezoning petition on only one of multiple issues decided by the Board did not preclude Court of Special Appeals from reviewing the sufficiency of the evidence in the administrative record for the Board's findings on other issues).

 On a legal issue, "a reviewing court is under no constraints in reversing an administrative decision which is premised solely upon an erroneous conclusion of law." *People's Counsel for Baltimore County v. Md. Marine Mfg. Co.*, 316 Md. 491, 497, 560 A.2d 32 (1989). The zoning ordinance central to this appeal is former section 21.80.030 of the Annapolis City zoning ordinance, now recodified without change material to this appeal at Code § 21.28.050. We give considerable weight to the Board's interpretation and application of this ordinance, because of that administrative agency's expertise in administering it. *See Marzullo v. Kahl*, 366 Md. 158, 172, 783 A.2d 169 (2001).

 For factual findings, "the correct test … is whether the issue before the administrative body is 'fairly debatable,' that is, whether its determination is based upon evidence from which reasonable persons could come to different conclusions." *White*, 356 Md. at 44, 736 A.2d 1072 (citation omitted). If we find evidence to support the Board's finding, we may not substitute our judgment, even if the evidence also supports different factual inferences. *See Mastandrea*, 361 Md. at 134, 760 A.2d 677. However, when "an administrative agency's conclusions are not supported by competent and substantial evidence, or where the agency draws impermissible or unreasonable inferences and conclusions from undisputed evidence, such decisions are due no deference." *Lewis*, 377 Md. at 407, 833 A.2d 563. "Whether reasoning minds could reasonably reach a conclusion from facts in the record is the essential test." *Stansbury*, 372 Md. at 182, 812 A.2d 312.

### Hardship

 The Chesleys argue that the Board erred in concluding that their need for the setback variance did not result from a hardship within the meaning of established case law. We disagree.

 In *Belvoir Farms Homeowners Ass'n, Inc. v. North*, 355 Md. 259, 734 A.2d 227 (1999), the Court of Appeals recognized that the purpose of zoning restrictions is "to prevent exceptions as far as possible," so that the specific need for the variance "must be substantial and urgent and not merely for the convenience of the applicant[.]" *Id.* at 276, 734 A.2d 227 (citing *Carney v. City of Baltimore*, 201 Md. 130, 137, 93 A.2d 74 (1952)). The *Belvoir Farms* Court held that a variance is warranted if the " 'applicable zoning restriction when applied to the property in the setting of its environment is so unreasonable as to constitute an arbitrary and capricious interference with the basic right of private ownership.' " *Id.* at 276, 734 A.2d 227 (quoting *Marino v. Mayor of Baltimore*, 215 Md. 206, 217, 137 A.2d 198 (1957)). Alternatively, if application of the zoning ordinance would deny the property owner "a reasonable and significant use for the property," there is also "unwarranted hardship" justifying a variance. *See id.* at 282, 734 A.2d 227. This hardship standard is "less restrictive than the unconstitutional taking standard." *See id.* "Whether a property owner has been denied a reasonable and significant use of the property is a question of fact best addressed by the expertise of the Board of Appeals, not the courts." *Id.*

In *White v. North*, 356 Md. 31, 49, 736 A.2d 1072 (1999), the Court of Appeals confirmed that "an unwarranted hardship can result from the denial of a reasonable and significant use," and that the local zoning agency is presumed to possess the "necessary expertise to decide what is reasonable and significant." In that case, the Court reversed judicial decisions that the local zoning board acted arbitrarily and capriciously in granting a buffer variance to construct a concrete swimming pool on a sloped lot. *See id.* at 52, 736 A.2d 1072. The *White* Court emphasized that determination of whether the proposed

pool was a reasonable and significant use, and whether denial of a variance was an unwarranted hardship, are factual findings on which courts must give deference to the Board. *See id.* at 50, 736 A.2d 1072.

The Chesleys rely on *Mastandrea v. North* for the proposition that their circumstances constitute a hardship. In that case, the Court of Appeals affirmed the local board's grant of a critical area variance to build a brick path along the waterfront of the Mastandreas' Talbot County home, for the purpose of enabling their wheelchair-bound child to enjoy that portion of the property. *See Mastandrea*, 361 Md. at 143, 760 A.2d 677. The Court held that the Talbot County Board of Zoning Appeals "was required to (and did) consider whether the property owners, in light of their daughter's disability, would be denied a reasonable and significant use of the waterfront of their property without the access that the path provided." *Id.* at 136, 760 A.2d 677. After examining the administrative record, the Court concluded that there was substantial evidence "establishing that, without the path, a person in a wheelchair could not enjoy the waterfront portion of the property." *Id.* In these circumstances, the board correctly granted the variance. *See id.* at 143, 760 A.2d 677.

The Chesleys argue that, like the Mastandreas, they are being denied a reasonable and significant use of their property, both to accommodate Billy's disability and to enhance pickup and drop off for the Chesleys' elderly mothers and young daughter. *Mastandrea*, however, has been largely abrogated by statutes, enacted in 2002 and 2004. *See Becker v. Anne Arundel County*, 174 Md.App. 114, 131–33, 920 A.2d 1118 (2007)(reviewing the legislative enactments). The General Assembly amended the critical area law for the explicit purpose of eliminating the "reasonable use within the buffer standard" used in *Mastandrea* and *Lewis v. Dep't of Natural Resources*, 377 Md. 382, 419, 833 A.2d 563 (2003).[8] As explained in *Becker*, the 2002 amendment

---

8. In *Lewis v. Dep't of Natural Resources.*, 377 Md. 382, 833 A.2d 563 (2003), the Court of Appeals held that, "with respect to variances in

added a requirement that in considering an application for a variance, the Board should consider the reasonable use of the entire parcel or lot for which the variance is requested. The preambles to the bills expressly stated that it was the intent of the General Assembly to overrule recent decisions of the Court of Appeals, in which the Court had ruled that .... a board could grant a variance if the critical area program would deny development on a specific portion of the applicant's property rather than considering the parcel as a whole.

*Becker,* 174 Md.App. at 132, 920 A.2d 1118 (emphasis in original). Judge James Eyler, writing for this Court in *Becker,* explained the 2004 amendment to the critical area law:

The General Assembly expressly stated that its intent in amending the law was to overrule *Lewis* and reestablish the understanding of unwarranted hardship that existed before being "weakened by the Court of Appeals." ... The amendment also created a presumption that the use for which the variance was being requested was not in conformity with the purpose and intent of the Critical Area Program. *See* § 8–1808(d)(2)(1).

*Id.* at 132–33, 920 A.2d 1118 (quoting 2004 Md. Laws, ch. 526); NR § 18–1808(d).

The *Mastandrea* Court cited, *inter alia,* the daughter's disability as a legitimate consideration by the Board. There is no question that a resident's disability could, in an appropriate case, be a non-controlling factor for the Board to consider in determining whether a hardship would exist if the variance in question is not granted.[9]

---

[critical area] buffer zones, the correct standard was ... whether he or she was being denied reasonable use within the buffer[.]" *Becker v. Anne Arundel County,* 174 Md.App. 114, 132, 920 A.2d 1118 (2007) (reviewing *Lewis).*

**9.** As in *Mastandrea v. North,* 361 Md. 107, 128–29, 760 A.2d 677 (2000), we do not decide whether federal disability laws can *compel* the granting of a variance to accommodate a disability.

The problem here is that we cannot say that the evidentiary record is so compelling that the Board was obligated to conclude that, without a garage to accommodate Billy's disability, a hardship exists. The record shows merely that Billy visits the Chesleys, and does not reside there. It does not reveal the frequency or duration of his visits. Moreover, there was no evidence to prove a "particular physical surrounding[], shape or topographical condition of the specific property" prevents the vehicular loading for which the Chesleys seek this garage variance. *See* former Code § 21.80.030(a). Indeed, the testimony was that the Chesleys were successfully using the property "as is" for parking and loading, by Billy and the Chesleys.

Rather, the essence of the Chesleys' argument is that a garage would make loading more convenient, and that a variance will allow them to locate the garage where the City's Planning Department preferred. The City Code requires more than a showing of "mere inconvenience[.]" *See* former Code § 21.80.030(A). As the Court of Appeals has recognized, it generally is not a hardship to be without a desired convenience or amenity on one's property, because zoning restrictions are to be enforced in the absence of a "substantial and urgent" need for a variance. *See Belvoir Farms Homeowners Ass'n*, 355 Md. at 261, 734 A.2d 227. When a variance would be required to build within the critical area buffer, for example, the fact that a particular improvement would enhance the owner's enjoyment of the property did not establish that it would be a hardship to continue using the property without the variance. *See, e.g., Citrano v. North*, 123 Md.App. 234, 717 A.2d 960 (1998)(fact that proposed deck created "pleasant amenity" did not create hardship); *North v. St. Mary's County*, 99 Md.App. 502, 519, 638 A.2d 1175 (owner's desire to build gazebo to read and view creek is not evidence of hardship), *cert. denied sub nom. Enoch v. North*, 336 Md. 224, 647 A.2d 444 (1994). The City Code's distinction between "mere inconvenience" and true hardship reflects the application of this principle to setback variances.

We conclude, therefore, that the Board drew an appropriate distinction between hardship and "mere inconvenience." Whether this particular variance is necessary to avoid hardship is a question of fact for the Board. *See Mastandrea,* 361 Md. at 143, 760 A.2d 677; *Belvoir Farms Homeowners Ass'n,* 355 Md. at 282, 734 A.2d 227. We find substantial evidence in the administrative record to support the Board's determination that the denial of a 27 ft. front yard setback variance would not be a "particular hardship" on the Chesleys, given their undisputed current use of their front yard for loading and the evidence supporting the Board's conclusion that the garage would be a "mere convenience."

### "Self–Created" Hardship[10]

Similarly, we are not persuaded by the Chesleys' contention that City planning authorities' insistence on the view cone covenant created their need for this garage variance. The Court of Appeals examined self-inflicted hardships in *Richard Roeser Prof'l Builder, Inc. v. Anne Arundel County,* 368 Md. 294, 793 A.2d 545 (2002); *Stansbury v. Jones,* 372 Md. 172, 812 A.2d 312 (2002); and *Lewis v. Dep't of Natural Resources,* 377 Md. 382, 833 A.2d 563 (2003). The lessons from those cases are instructive here.

In *Roeser,* a developer bought a lot with knowledge that a variance from the critical area buffer would be necessary to build a house of the size that it planned. The local zoning board denied the variance on the ground that the conditions surrounding the request were " 'self-created.' " *See Roeser,* 368 Md. at 297, 793 A.2d 545. The circuit court reversed, holding that " '[h]ardships of this type are normally those which are created by the owners of the property and not by the property itself.' " *Id.* at 298, 793 A.2d 545. The court reasoned that Roeser had not created the topography and placement of the property, which were the reasons that the lot required a variance. *See id.*

---

10. We address this variance criteria because the Board cited it as additional reason to deny the variance.

■■■ The Court of Appeals affirmed the circuit court's decision and rationale. *See id.* at 320, 793 A.2d 545. Writing for the Court, Judge Cathell explained that

[t]he types of hardships that are normally considered to be self-created in cases of this type do not arise from purchase, but from those actions of the landowner, himself or herself, that create the hardship, rather than the hardship impact, if any, of the zoning ordinance on the property.

*Id.* at 314, 793 A.2d 545. Thus, the "typical type of self-created hardship [is] ... an act of commission by the owner[.]" *Id.* at 317, 793 A.2d 545. Mere purchase of a property, even with knowledge that a variance will be needed in order to accomplish the purchaser's plans, does not constitute a self-created hardship meriting denial of a variance request, because zoning law regulates the property itself, rather than the title to it. *See id.* at 319, 793 A.2d 545. Therefore, " '[i]t should not be within the discretion of a board of appeals to deny a variance solely because a purchaser bought with knowledge of zoning restrictions[.]' " *Id.* at 304, 793 A.2d 545 (quoting 3 Arden H. Rathkopf & Daren A. Rathkopf, *The Law of Zoning and Planning* § 58.22, 141–48 (1991)).

To illustrate this principle, the *Roeser* Court contrasted the mere purchase of a property in the hope of obtaining a variance with instances in which the property owner took some affirmative action that created the hardship for which the variance was sought. The cited case law included examples of buildings constructed in violation of established setbacks, height restrictions, and building permit requirements. *See id.* at 314–16, 793 A.2d 545. *See, e.g., Ad + Soil, Inc. v. County Comm'rs of Queen Anne's County,* 307 Md. 307, 316, 340, 513 A.2d 893 (1986)(construction that violated setbacks was self-inflicted condition creating need for requested variance request); *Randolph Hills, Inc. v. Montgomery County,* 264 Md. 78, 83, 285 A.2d 620 (1972)(subdivision that created unbuildable lot was self-inflicted condition creating variance request); *Salisbury Bd. of Zoning Appeals v. Bounds,* 240 Md. 547, 554–55, 214 A.2d 810 (1965)(construction without building permit was self-inflicted condition creating variance

request); *Wilson v. Mayor of Elkton,* 35 Md.App. 417, 428, 371 A.2d 443 (1977)(addition of unit to nonconforming apartment building was self-inflicted condition creating need for setback variance).

In *Stansbury,* the Court considered a variance request by a property owner who, in accordance with local ordinances encouraging her to do so, combined "antiquated lots" that did not conform with current lot size requirements, then sought to re-subdivide them into "closer-to-standard" size lots. The problem was that some of the resulting lots were subject to percolation requirements that made them unbuildable without a variance. The owner attempted to obtain variances from those restrictions. *See Stansbury,* 372 Md. at 175, 812 A.2d 312.

The Court of Appeals held that the variance request did not result from self-inflicted conditions or self-created hardship. *See id.* at 198–201, 812 A.2d 312. The Court recognized that the need to obtain a variance arose from the property owner's combination of non-conforming lots, which admittedly was an act of "commission," but distinguished that action as one the legislature actively encouraged. *See id.* at 200–01, 812 A.2d 312. It reiterated that "[t]raditionally, self-created hardship requires an affirmative action, exclusively by a property owner or his predecessor in title, that is itself the sole reason for the need for the variance[,]" and reasoned that "subdividing property in accordance with all applicable statutes does not, generally, constitute a self-created hardship[.]" *Id.* at 192, 198, 812 A.2d 312.

In *Lewis v. Dep't of Natural Resources,* the Court of Appeals again rejected the notion that a property owner's purchase of land that cannot be developed as the owner wishes without a variance constitutes a self-created hardship. There, Lewis began to build a hunting camp for his personal use, on an island that he already used for hunting. He belatedly discovered that the critical area buffer consumed 96 percent of the property, including the camp site, then halted construction and sought a variance. The Court of Appeals vacated the

local board's denial of the variance, holding, *inter alia,* that the request did not result from a self-inflicted hardship. *See id.* at 422, 833 A.2d 563.

The Court emphasized that Lewis's premature construction did not create the hardship. "The existence of the partially constructed camp, in no way, was determinative of his need for a variance." *Id.* at 424, 833 A.2d 563. Lewis still would have needed a variance even if there had been no construction. *See id.* Thus, the presence of already constructed buildings was "a 'red herring' " because the owner "needed a variance to build any camp on the island[.]" *Id.* at 425, 833 A.2d 563.

The Chesleys cite *Stansbury* in support of their argument that they did not create the hardship they now claim. *Stansbury* is easily distinguished, as are *Lewis* and *Roeser,* because there was substantial evidence to support the Board's finding that the Chesleys' need for this variance resulted from their unilateral decision to build a large house before obtaining a decision on whether the garage variance would be granted.

The Chesleys' argument that the Planning Department negotiated this plan, then failed to deliver a final approval, has some superficial appeal. To be sure, correspondence from the City makes it clear that the view corridor easement was required by the City as a condition to approval of the Chesleys' house and pool plans. City planners took the site plan review criterion that scenic views "shall be preserved and protected to the maximum extent as practicable" (Code § 21.98.050.E) as justification for making the view corridor "a major factor" in approving the plans for the Chesley residence. The Planning Director insisted that preservation of the water view across the Chesley property was required by law, citing several code sections, and told the Chesleys that it "will be necessary" to execute "appropriate documents to preserve the view across your side yard." The Planning Department explicitly conditioned approval of the Chesleys' home plans and a demolition permit for the existing house on the lot upon recordation of the view cone agreements.

Given the course of dealing between the Chesleys and the Planning Department, however, the record supports the Board's determination that the view cone agreements were not a binding *quid pro quo* for the **garage** variance, but a negotiated part of the Chesleys' deal to obtain the City's permission to demolish the existing **house** and build a much larger one. The Board was entitled to conclude, as it apparently did, that given Mr. Chesley's extensive experience as a real estate developer and the Board's denial of the Chesley variance application in 2002, the Chesleys understood that the Board alone had the power to grant the variance they would need to build the garage in the location favored by planning authorities. *See infra*, part II. Although the Planning Department promised to support such a variance, there was never a binding promise that the Board would approve one.

Ultimately, the Chesleys' contention that the Board erred in finding that they could have avoided the need for a setback variance by designing their home differently rests on the flawed premise that they cannot be held accountable for choosing to build a 5,000 sq. ft. residence before obtaining the variance necessary to build the garage. In contrast to the hunting camp in *Lewis*, then, the Chesley garage might have been built without a variance. Moreover, in contrast to *Stansbury*, there is substantial evidence in this record to support the Board's determination that the Chesleys' predicament did not result from mere compliance with applicable zoning and development laws, but from the Chesley's own actions in developing the property.

The record supports the Board's finding that the Chesleys created the need for the variance by developing the property before obtaining the garage variance. When they built their house and pool, the Chesleys eliminated the possibility of locating a garage where no variance would be required. Among the options the Chesleys chose not to pursue was designing a smaller house that would permit a detached garage on the side of the property, opposite the viewshed that City planners were seeking to protect, in a location that would not require a setback variance. Alternatively, the Chesleys

could have waited for a ruling on their garage variance application before proceeding with construction of the larger house and pool. Instead of getting the Board's answer first, so that they could reconsider their development plans if the Board denied a front yard setback, the Chesleys proceeded to build the house and pool at the risk of what happened here— that the Board would not approve a front yard variance for the garage, notwithstanding support by the Planning Department for the Chesleys' applications. In these circumstances, we find no legal or factual error in the Board's conclusion that the Chesleys' claimed hardship was self-created.

### Neighborhood Impact

Citing testimony and community "[c]oncerns ... about the negative impact on the streetscape[,]" the Board found "that adding a garage at this location will contribute to the walling off [of] that side of Eastern Avenue with structures and create a visually unattractive streetscape." This phenomenon "would substantially diminish or impair property values in the neighborhood." The Chesleys argue that the testimony of two neighbors in opposition to the variance on the question of how the proposed garage would impact the neighborhood does not provide a reasonable basis for the Board's conclusions.

Marty Russell, the Chesleys' next door neighbor, opposed the variance, claiming that "seven out of the ten immediate neighbors across the street" also opposed the garage in letters to the City.[11] Ms. Russell complained that

the walling off of that side of Eastern with structures creates a visibly unattractive street scape for the neighbors and it could have a negative effect on property values. And it has already been mentioned, it completely blocks our house from view. And I have two realtor friends [who] ... feel that it would definitely impact and lower our property values slightly which is not a really big issue but it's there. The garage also for me personally, if you are asking about

---

11. The record presented to this Court does not contain any such letters.

neighborhood impact, and I'm the immediate neighbor, will cut out light and air coming into my kitchen and my side of the house. I've already got their house structure which totally obliterates all the southern sun that ... used to come into my home .... and that's gonna eliminate completely the rest of that late afternoon sun which is the only sun that I get on that side of the house anymore.

Carolyn Kantor, a neighbor whose house is situated "across the street and two houses over" and who is a named beneficiary of the view cone agreement, also opposed the Chesleys' garage at the hearing. Kantor complained, *inter alia,* that "overbuilding and overcrowding loom on the horizon" due to the "rush to build the largest house possible and sell it for top dollar." She stated that she wants to enjoy the "beauty of Eastern [Avenue] from my front porch without having to look at another imposing structure across the street and find the solace that first attracted me" to the street in 1997.

During public deliberations, the Board reviewed and considered, *inter alia,* its July 17, 2002 ruling on the Chesleys' previous variance application for a two car garage. The Board's 2002 opinion mirrors the Board's subsequent findings regarding neighborhood impact of the 2005 proposal:

Neighborhood Impact: There was much testimony presented, both in writing and at the hearing, that neighboring property owners objected to the location of the proposed garage. A petition signed by over forty property owners was submitted objecting to any variances on the property. Some of those signatories withdrew their initial objection when the applicant agreed to withdraw his request for the side yard variance; however there remained numerous parties still objecting to any setback variance to permit a garage. **The testimony was that the new residence under construction is substantially larger than the structure it replaced and the neighbors are concerned about additional bulk on the property. Concerns were also raised about the negative impact on the streetscape of the proposed garage so near to the street. Adding a garage at this location will contribute to the walling off that**

side of Eastern Avenue with structures and create a visually unattractive streetscape for the neighbors and could have a negative effect on property values.... [F]or the reasons stated above, the Board finds that the requested variance would have a negative impact on the neighborhood. (Emphasis added.)

During deliberations, both members of the Board's majority also noted the next-door neighbor's concern about property devaluation and that the Chesley "garage would block the view of her home."

In support of their "arbitrary and capricious" challenge to the Board's negative findings regarding neighborhood impact, the Chesleys rely on the Court of Appeals' decision in *Lewis v. Dep't of Natural Resources*, 377 Md. 382, 407–09, 833 A.2d 563 (2003), vacating the denial of a critical area variance. Specifically, they cite the *Lewis* Court's ruling that "the record contains little or no empirical data to support the Board's conclusions or to refute the studies and reports of petitioner's experts." *See id.* at 409, 833 A.2d 563. The Chesleys posit that all evidence presented to the Board, with the exception of the testimony of the two neighbors recounted above, supported the Chesley variance. In their view, this record does not provide a reasonable basis for the Board's negative findings. We disagree.

As a threshold matter, the Chesleys' argument ignores the photographic and map evidence. These exhibits, presented by the Chesleys themselves, support the Board's finding that the proposed garage will "contribute to the walling off" of the streetscape on this waterfront side of Eastern Avenue, by adding a structure that blocks significant portions of both the Russell and Chesley lots from street view.

The Chesleys acknowledge in this Court that the garage would directly obstruct approximately 25 percent of their own facade, consuming "20 feet of the 85 feet of street frontage" when viewed from directly in front of the Chesley home. At the Board hearing, the Chesleys' attorney conceded that the

planned one-story garage "somewhat masks the Russell garage" next door, as well as "the Chesley home" itself.

The extent of the streetscape impact is shown by the plans and photographs confirming that the new structure would sit next to the Russells' detached garage in such a way as to obscure portions o f both the Russell and Chesley facades from the streetscape. For example, the Chesleys' photographic illustration of the street with the proposed garage "photo-shopped" in place demonstrates that an existing view of the front part of the Russell home, now visible from the street and Ms. Kantor's property, between the Russell garage and the Chesley home, would be entirely blocked by the proposed garage.

In addition to this evidence, the Board was entitled to consider and credit the neighbors' complaints regarding the effect of the proposed garage on the Eastern Avenue streetscape. Observations and opinions regarding the view from and to one's own property, and the effect that diminished views would have on enjoyment of one's property, are not the type of lay opinions that must be supported by empirical data or expert testimony. *Cf. Anderson v. Sawyer,* 23 Md.App. 612, 618–19, 329 A.2d 716 (1974)(lay witness testimony about "traffic congestion" concerns did not rebut qualified traffic expert's testimony that street was capable of absorbing traffic increase created by proposal).

Here, Russell had a reasonable basis, as the next-door neighbor who would look out her window onto the new Chesley garage rather than the Eastern Avenue streetscape, and whose own house would become completely obstructed from street view to pedestrians and vehicles traveling toward Horn Point, to complain about the elimination of her home from that streetscape, as well as the negative effect of the proposed garage on her property's views, air, and light. Similarly, Kantor had a reasonable basis, as a neighbor whose view of the Chesley and Russell properties would be affected by the proposed garage, to complain that overcrowding and "imposing structure[s]" harm her views and enjoyment of the neigh-

borhood. Moreover, because the City is charged with pre-
serving the "small, intimate scale" of Eastport, the City was
entitled to rely on this evidence in determining that the
proposed garage would damage this streetscape. *See* City of
Annapolis Dep't of Planning and Zoning, *The Eastport Resi-
dential Conservation Overlay District: A Guide to the Pro-
cess and Design Guidelines* 2.

## II.

### City's Appearance Before The Board

■ The Chesleys ask this Court to "either dismiss the
City as a party to the petition for judicial review or bar the
City from presenting any argument in the courts that is
contrary to the positions it took before the Board of Appeals."
They argue that,

> when the City appears as a party at a public hearing before
> the Board, through officials who work for the City's Plan-
> ning Department, and when those officials testify in favor of
> a variance, it is improper for the City in a petition for
> judicial review of the Board's decision to oppose the vari-
> ance by taking positions contrary to the positions the City
> took before the Board.

Citing principles of judicial estoppel, the Chesleys point to the
testimony of City planners Kevin Scott and Tom Smith that
the Chesleys suffer a hardship caused by the three sets of
zoning regulations, as well as Planning Director Jon L. Ara-
son's written report to the same effect.

■ To be sure, a party may not take a position in an
administrative proceeding and then take the contrary position
in a subsequent court proceeding. *See Abrams v. Am. Tennis
Courts, Inc.*, 160 Md.App. 213, 224–25, 862 A.2d 1094 (2004),
*cert. denied*, 386 Md. 181, 872 A.2d 46 (2005); *Chaney Enter.
Ltd. P'ship v. Windsor*, 158 Md.App. 1, 45, 854 A.2d 233
(2004). But the Chesleys' argument fundamentally mischarac-
terizes the positions of the Planning and Zoning Director and
his staff as binding decisions made by the City itself. The
Board of Zoning Appeals, not the Planning Director, is the

entity authorized to make the City's final decision on a variance application. See City Code § 21.08.040. The Board's decision not to accept the recommendations of the Planning Department must be permitted, or else the Planning Department would effectively become the final arbiter of every variance. Thus, the City's position on this variance was established when the Board denied the Chesleys' application, and is consistent with the City's subsequent opposition to the variance during judicial review.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**