854 A.2d 283

**CAPITAL COMMERCIAL PROPERTIES, INC.**

v.

**MONTGOMERY COUNTY PLANNING BOARD**
of the Maryland–National Capital Park and
Planning Commission et al.

**No. 0388, Sept. Term, 2003.**

Court of Special Appeals of Maryland.

*July 19, 2004.*

Kinley R. Dumas (Stephen J. Orens, DuFour & Kohlhoss, Chtd. on the brief), Bethesda, for appellant.

Debra Yerg Daniel and Scott C. Wallace (Michele Rosenfeld, Maryland–National Capital Park and Planning Commission on the brief), Silver Spring (Stephen Z. Kaufman, Linowes and Blocher, LLP on the brief), Bethesda, for appellee.

Argued before MURPHY, C.J., DEBORAH S. EYLER and LAWRENCE F. RODOWSKY (retired, specially assigned), JJ.

RODOWSKY, Judge.

These cross-appeals concern a preliminary plan approval in Montgomery County. CBS Associates Limited Partnership (CBS), one of the appellees, is the fee owner of the land comprising Stoneymill Square Shopping Center (Stoneymill). CBS seeks to enlarge the retail area of Stoneymill by erecting a freestanding building. In pursuit of that purpose, CBS filed preliminary plan 1–02006 (the Plan) with appellee and cross-appellant, the Montgomery County Planning Board of the Maryland–National Capital Park and Planning Commission (the Board). The Plan proposes creating a new lot by combining the whole of one, and part of another, existing lot. Capital Commercial Properties, Inc. (CCP), the appellant and cross-appellee, is the ground lessee of part of Stoneymill. Fearing that the CBS project adversely will affect parking for its patrons, CCP opposes the project.

The Board approved the Plan, subject to conditions, and the Circuit Court for Montgomery County affirmed the Board in an action for judicial review. CCP appealed to this Court and presents the following issues for our review.

"I. Whether the circuit court erred by holding that [the Board] properly exercised its authority when it failed to make the finding required by Section 50–29(c) of the subdivision regulations, that the lot width and depth of the subject property are adequate to accommodate the off-street parking requirements and minimum setbacks prescribed by the zoning ordinance.

"II. Whether the decision of the [Board], affirmed by the circuit court, was supported by substantial evidence of record.

"III. Whether the decision of [the Board], affirmed by the circuit court, violated, as a matter of law, appellant['s] protected rights to property in which it holds a recorded 99–year leasehold interest.

"IV. Whether the circuit court erred in holding that the record plat approval process is separate and distinct from the preliminary plan approval process.

"V. Whether the circuit court erred in admitting appellees' supplementary exhibit at oral argument before the court."

In its cross-appeal, the Board raises these additional issues:

"V. Whether the circuit court erred in limiting the purpose for admitting the ... Board's and CBS' supplementary exhibit.

"VI. Whether the circuit court erred in admitting the ground lease between appellant and CBS as appellant's supplementary exhibit."

Stoneymill, located in the Kensington–Wheaton Policy Area, is bounded on its southwestern side by Viers Mill Road, on its northeasterly side by Randolph Road, and on its north side by Colie Drive. As shopping centers go, Stoneymill is old, having been built in the 1950s or 1960s. It contains 12.5 acres, including 123,000 square feet of retail uses. The proposed newly configured lot, Parcel P, consists of 5.5 acres. The new, freestanding building intended to be constructed thereon is planned to add 12,425 square feet of retail usage. Parcel P is zoned C–1, as to 4.8 acres, and R–60, as to .7 acre. By a special exception, granted by the Board of Appeals in October 1961, 1.0246 acres of residentially zoned land along the south side of Colie Drive was permitted to be used for parking in conjunction with the shopping center. The setback requirements, if any, in effect at the time parking areas were laid out along Colie Drive, were not as restrictive as those currently in effect.

In November 1960, CCP's predecessor in interest entered into a ninety-nine year ground lease with CBS's predecessor in interest of 325,281 square feet, or 7.467 acres, of Stoneymill. The ground lease includes a former Ames Department store, adjacent to Parcel P, and all of Parcel L, which lies within Parcel P along the south side of Colie Drive. Under the lease, CCP claims parking and access rights, in common with others, in Parcel P. The Plan would use part of Parcel L in conjunction with parking.

## The Agency Record

CCP contended before the Board that the Plan violated Montgomery County Code (1984), Chapter 50, "Subdivision of Land," § 50–29(c).[1] Specifically, CCP asserted that the width and depth of Parcel P were inadequate to accommodate the off-street parking and minimum setback requirements mandated by the Zoning Ordinance.[2] Section 50–29(c) provides:

"(c) *Nonresidential lots.* Depth and width of lots reserved or laid out for commercial and industrial purposes shall be adequate for the off-street service and parking requirements needed by the type of use and development proposed."

The minimum parking required for the enlarged center, at the ratio of five spaces for each 1,000 square feet of retail usage, would be 268 spaces. The Plan projected 293 spaces. Before the Board, CCP presented evidence directed to showing that only 222 spaces could be achieved. The premise of CCP's analysis was that the Plan would have to comply with setback requirements adopted in 1984, because the added retail space was a new, freestanding building and not an expansion of an existing building. Consequently, CCP submitted, the Plan principally would lose parking spaces along Colie Drive, due to the twenty-five foot setback that is currently required because the land on the north side of Colie Drive, a seventy-five foot right-of-way, is zoned R–60. CCP argued that § 50–29(c) obligated the Board to apply the current setbacks in its consideration of the Plan. Accordingly, CCP concluded, the depth and width of the lot laid out was not adequate for off-street parking, and the Plan should be rejected.

Anticipating CCP's position, counsel for the Board, on the record at the hearing, advised the Board that the issue of parking spaces was for the Department of Permitting Services

---

1. Unless otherwise specified in this opinion, all statutory references are to the Montgomery County Code (1994), as amended.

2. The Montgomery County Zoning Ordinance is Chapter 59 of the Montgomery County Code (1994), as amended.

(DPS) to decide when considering the parking facilities plan (PFP)—advice that the Board accepted. In a written opinion approving the Plan, with conditions, the Board found that "the depth and width of the proposed lot are adequate for the off-street service and parking needed for the proposed use[.]" Among the conditions to which the approval was subject was the following:

> "Prior to issuance of building permit, [CBS] to comply with the provisions under Article 59–E of the Montgomery County Zoning Ordinance and submit a parking facilities plan to DPS for review and *approval.*"

(Emphasis added). In view of this condition, the Board concluded that the parking requirements of § 50–29(c) were satisfied.

CCP also pointed out to the Board that, under the ground lease, CCP had possession of Parcel L for another sixty-six years. The lessee questioned how, without its consent, CBS could include Parcel L in proposed Parcel P. The Board, however, held that its decision must be based on ownership.

### Circuit Court Judicial Review

In the Circuit Court for Montgomery County, CCP's memorandum of law in support of its petition for judicial review raised only the following two issues:

"I. Whether the Planning Board's refusal to review the parking plan submitted with the preliminary plan was erroneous as a matter of law, in violation of the requirements of Section 50–29(c) for adequate lot width and depth to accommodate required parking and minimum setbacks prescribed by the zoning ordinance.

"II. Whether the Planning Board, when approving a Preliminary Plan subject to conditions, must find that the plan as amended by the Board's conditions must comply with all requirements of the Subdivision Regulations and applicable provisions of the Zoning Ordinance, including requirements for recordation, pursuant to the holding in *Lee v. Maryland–National Capital Park and Planning Commission.*"

Attached to this memorandum were exhibits that the Board moved be stricken from the record because they were not before the Board when it made its decision. The exhibits were two leases between the predecessors in interest of CCP and CBS and a preliminary plan drawing. The Board's motion to strike was denied.

When the Board and CBS filed their answering memoranda, they attached exhibits, including the PFP for the project. Over CCP's objection, the court admitted the PFP for the limited purpose of showing the date of its approval by DPS.

### Standard Of Review

 Our review of the decision of an administrative agency is limited.

"When reviewing a decision of an administrative agency, this Court's role is 'precisely the same as that of the circuit court.' 'Judicial review of administrative agency action is narrow. The court's task on review is *not* to "substitute its judgment for the expertise of those persons who constitute the administrative agency." ' "

"Rather, '[t]o the extent the issues on appeal turn on the correctness of an agency's findings of fact, such findings must be reviewed under the substantial evidence test.' The reviewing court's task is to determine 'whether there was substantial evidence before the administrative agency on the record as a whole to support its conclusions.' The court cannot substitute its judgment for that of the agency, but instead must exercise a 'restrained and disciplined judicial judgment so as not to interfere with the agency's factual conclusions.' "

*Stover v. Prince George's County*, 132 Md.App. 373, 380–81, 752 A.2d 686, 690 (2000) (citations omitted).

 In this case, in contrast to factual challenges, the principal issue is the construction of § 50–29 as it applies to the basically undisputed facts of the instant matter. Under these circumstances

"the substituted judgment standard is used with respect to a claim that the agency erred as a matter of law. A challenge as to a regulatory interpretation is, of course, a legal issue. Upon appellate review, however, courts give special weight to an agency's interpretation of its own regulations. As this Court explained:

> " '[C]ourts bestow special favor on an agency's interpretation of its own regulation. Recognizing an agency's superior ability to understand its own rules and regulations, a "court should not substitute its judgment for the expertise of those persons who constitute the administrative agency from which the appeal is taken." ' "

*Department of Health & Mental Hygiene v. Riverview Nursing Centre, Inc.,* 104 Md.App. 593, 602–03, 657 A.2d 372, 376–77, *cert. denied,* 340 Md. 215, 665 A.2d 1058 (1995) (citations and attribution omitted).

Judge Eldridge, writing for the Court of Appeals in *Board of Physician Quality Assurance v. Banks,* 354 Md. 59, 729 A.2d 376 (1999), expressed the concept in the following fashion:

> "Even with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency. Thus, an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts."

*Id.* at 69, 729 A.2d at 381.

The Board also asserts that certain of CCP's issues in this Court are not preserved for our review because they were not raised before the administrative agency. Under settled Maryland law, appellate review of administrative decisions is limited to those issues and concerns raised before the administrative agency. *Mayor & City Council of Rockville v. Woodmont Country Club,* 348 Md. 572, 582 n. 3, 705 A.2d 301, 305 n. 3 (1998). As the Court of Appeals has explained:

> " 'A reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground

not theretofore presented and deprives the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action.' We do not allow issues to be raised for the first time in actions for judicial review of administrative agency orders entered in contested cases because to do so would allow the court to resolve matters *ab initio* that have been committed to the jurisdiction and expertise of the agency."

*Delmarva Power & Light Co. v. Public Service Comm'n of Md.*, 370 Md. 1, 32, 803 A.2d 460, 478 (2002) (citations omitted).

## I. Compliance with § 50–29(c)

■■■ There is no disagreement between the parties that this project requires a PFP and that, because it does not require site plan approval, the PFP "must be submitted to the Director [of DPS] for review and approval at the time of application for a building permit." See § 59–E–4.1.[3] Thus, the issue here is whether § 50–29(c) requires that the Board itself interpret and apply the setback provisions of the Zoning Code to determine whether the depth and width of 5.5 acre Parcel P, with the new 12,425 square foot building, are adequate for the off-street parking requirements of the proposed use, or whether the condition requiring DPS approval of the site's PFP satisfies § 50–29(c). CCP argues that the Board cannot

---

3. Section 59–E–4.1 addresses the requirement for parking facility plans for projects constructed in accordance with building permits filed after June 28, 1984. The section in relevant part reads:

"For any use that requires 25 or more parking spaces, a parking facilities plan must be submitted:

"(a) For development that requires site plan approval ... a required parking facilities plan must be submitted to the Planning Board for review and approval as part of the site plan review process.

"(b) For development that does not require site plan approval ... a required parking facilities plan must be submitted to the Director [of DPS] for review and approval at the time of application for a building permit.

"The Department [of Permitting Services] must review all parking facilities plans to determine that all entrances and exits proposed to public roads and the internal movement of traffic in a parking facility will allow safe vehicular movement."

approve a preliminary plan for a building lot that shows the proposed building encroaching into setback areas, and CCP submits that the instant matter is no different. The appellees, to the contrary, submit that adequacy of parking is much less rigid a concept, and more complex a land use analysis in the instant matter, than CCP's analogy to siting a building on a lot.

Section 59–E–4.4 sets forth the contents required of a PFP as follows:

"The parking facility [sic] plan shall show the location and design of entrances and exits to public roads; the location and size of all buildings and structures; the location of parking spaces, directional markings, traffic-control devices and signs; walls and fences; landscape areas; slopes or berms; change of grades; planting materials, including the type and names of the materials to be planted; and such other information as required by either the director or the planning board. The parking facility [sic] plan shall be prepared with careful regard to the objectives for parking facilities enumerated in section 59–E–4.2 and the relationship between the parking facility and surrounding commercial, industrial, or residential improvements. Parking areas, therefore, shall be located so as to prevent an adverse effect on such adjoining or neighboring properties. Shrubs, trees, walls, fences, berms or other materials used as a screen shall be of a permanent nature, requiring as little maintenance as possible. Planting strips in which trees or other natural growth are located shall be of sufficient width or shall be so designed so that the plantings and trees are protected from vehicles in accordance with section 59–E–2.74. Trees and plants shall not be of a variety that contains offensive or injurious gum, moisture, fruit or seed droppings. Plantings and structures shall be located with due regard to traffic safety and effective mechanical snow removal."

Under § 59–E–4.3, a PFP must satisfy the following requirements:

"(a) Effective landscaping of parking lots contiguous to or adjacent to any public road shall be provided in accordance with the landscaping requirements of section 59–E–2.7.

"(b) Safe sight distances free of any obstruction shall be provided at all entrances and exits to public roads. Ample safe sight distances clear of any building or other artificial or natural obstructions shall be provided at the corner of intersecting public roads.

"(c) Effective channelization and division of parking areas within the interior of a parking facility shall be provided for both pedestrian and vehicular traffic. This may be accomplished by use of landscaped areas with trees, walls, fences, other natural growths or artificial features, raised curbs, marked directional lanes and controls, change of grade or other devices to mark points of turn, to separate parking areas and to control traffic movement.

"(d) Parking facilities containing 500 or more parking spaces shall be divided into several smaller parking areas and shall be separated from each other by landscaping, change of grades, buildings or other natural or artificial means.

"(e) Each parking facility shall be designed individually with reference to the size, street pattern, adjacent properties, buildings and other improvements in the general neighborhood, number of cars to be accommodated, hours of operation and kinds of use."

If compliance with setbacks must be determined by the Board in all cases, as part of preliminary plan approval, as CCP argues, then the ordinances create a duplicative process. Consider a hypothetical case in which, as here, the ultimate administrative decision on the PFP is vested in DPS. The Board, exercising the CCP version of its power, finds that the parking space setbacks comply with the code. DPS, however, in its review of the many aspects of a PFP, set forth above, requires changes in the submitted PFP that reconfigure the

setbacks. Assume further that DPS approves the revised PFP. The result is that the Board and its staff would have spent their time in reviewing setbacks in a parking plan that is not the design for which a building permit is issued. Surely the ordinances are not to be read as requiring, in our hypothetical, that the PFP, as approved by DPS, be sent back to the Board, in order to see if it would approve the setbacks in the modified PFP. Where, as with the subject project, PFP approval, modification, or rejection, rests with DPS, the reasonable construction of §§ 50–29(c) and 59–E–4.1 is that setback compliance is determined by DPS.

The illogic of the Board's determining setback compliance of a PFP at the preliminary plan approval stage is demonstrated further by the waiver power conferred on DPS by § 59–E–4.5. In relevant part, that section provides that "the Director, Planning Board, or Board of Appeals may waive any requirement in this Article [59–E. "OFF–STREET PARKING AND LOADING"] not necessary to accomplish the objectives in Section 59–E–4.2[.]" Here, the relevant entity for exercising the waiver power is the Director of DPS, inasmuch as that agency, per § 59–E–4.1, exercises the ultimate PFP approval authority. Consequently, even if the Board were presented with a preliminary plan that reflected parking spaces in a setback area, the Board should not reject a preliminary plan, for setback violations, when DPS could grant a waiver and issue a building permit.

In the instant matter, CBS advised the Board that it believed that DPS would find it exempt from bringing its parking plan up to code because the increase in floor area would not be greater than ten percent of that already existing. Counsel for the Board also advised the Board that DPS had granted waivers on parking spaces to commercial uses "across the street" from Stoneymill. These comments seemingly refer to the following provisions.

Section 59–E–5.51 in part states:

"All parking facilities constructed in accordance with an approved building permit, filed prior to June 28, 1984, that

do not conform to the requirements of this article shall not be considered in violation of this article."

Section 59–E–6.1 in part states:

"In accordance with the exception provisions of section 59–E–5.51, parking facilities constructed in accordance with an approved building permit, filed prior to June 28, 1984, that do not conform to the requirements of this article, are not considered in violation of this article. Under the following circumstances, however, such parking facilities must be brought into conformance with the requirements and standards of this article unless waivers from specific requirements are approved under the waiver provisions of section 59–E–5.52. . . .

"(a) For any enlargement or reduction of a building or structure that is greater than 10 percent of the total floor area approved prior to June 28, 1984, the off-street parking must be brought into conformance with the requirements and standards of this article."

Section 59–E–5.52 reflects that the power to waive the compliance requirements rests with the Director or the Board, presumably in accordance with whether site plan approval was required or not, as set forth in § 59–E–4.1.

We intimate no opinion on the applicability of these provisions to the PFP in the instant matter. They are relevant, however, to illustrate further why, in cases where DPS ultimately decides on a PFP, the county council intended that DPS be the agency exercising the power to determine parking setbacks, rather than the Board, acting under § 50–29(c).

## II. Substantial Evidence

At the hearing before the Board, CBS frankly acknowledged that it could not proffer that it "would be able to set back existing spaces under the current requirements. It simply would make the project not feasible[.]" From this, CCP argues that there was no substantial evidence of setback compliance so that the Board violated § 50–29(c). This argument is an attempt to recycle, as a factual issue, the legal

issue that we have already decided in Part I, *supra.* Inasmuch as it was not the function of the Board, in this case, to determine setback compliance, the lack of substantial evidence before the Board is immaterial.

## III. Role of the Ground Lease

Before the Board, CCP complained that the Plan was inconsistent with its rights under the ground lease, representing that the ground lease called for a ratio of three square feet of parking for each square foot of ground floor in the building. The Board concluded that its decision was to be based on ownership of Parcel P. In this Court, CCP argues that its rights under the ground lease become part of the preliminary plan approval process by virtue of § 59–A–2.2(c). That section provides: "This chapter shall not be deemed to interfere with or abrogate or annul or otherwise affect in any manner whatsoever any ordinances, rules, regulations or easements, covenants or other agreements between parties[.]"

The Board's initial response here is that this issue is not preserved because it was not raised before the Board. We agree. CCP never contended before the Board that, by approving the Plan, the Board would be violating § 59–A–2.2(c).

Even if preserved, however, CCP's argument fails. The Court of Appeals addressed and rejected an identical argument, based on the predecessor § 59–A–2.2(c), in *Perry v. County Board of Appeals for Montgomery County,* 211 Md. 294, 127 A.2d 507 (1956). In that case, the Court held that the provision

> "does not say, nor should it be taken to mean, that the rest of the ordinance must not be administered and decisions made under it, solely on the basis of its own provisions. The ordinance does not override or defeat whatever private rights exist and are legally enforceable, but neither is it controlled in its workings or effects by such rights. The enforcement of restrictive covenants is a matter for the exercise of the discretion of an equity court in the light of

attendant circumstances. . . . Such private restrictions controlled by contract and real estate law are entirely independent of zoning and have no proper place in proceedings of this character, notwithstanding if in a proper proceeding the restrictions contended for are shown to be binding upon the properties mentioned, zoning cannot nullify them. . . . Neither [the administrative agency's] action nor our approval of that action would have any effect on the decision in a proceeding in equity to enforce the covenant."

*Id.* at 299–300, 127 A.2d at 509.

## IV. Record Plat Consent Requirement

 Section 50–36(d) sets forth the requirements for a subdivision record plat. These include a "[c]ertificate by the owner and all parties of interest, in a form approved by the Board, adopting the Subdivision Record Plat[.]" § 50–36(d)(4). CCP argues that it is a party of interest, that it never will relent in its opposition to the Plan, and that it never will consent at the stage of a subdivision record plat. Accordingly, CCP submits, the Board was obliged to consider that opposition and deny the Plan at the preliminary subdivision stage.

The Board's threshold answer is that this issue was not raised before it. When addressing the Board's answer in its reply brief, CCP does not direct us to any part of the record before the Board evidencing that this issue was raised at the agency level. Nor have we found where the issue was raised there. The issue was raised first before the circuit court. It concluded that the issue was premature, because the process for reviewing and approving record plats was separate and distinct from that for preliminary plans, and the decision on the former could be an appealable event. Responding in this Court to the circuit court's analysis, CCP bases its argument, in part, on the practices of the Board.

We shall assume, without deciding, that CCP is a party of interest in Parcel P. The contention that the Board cannot conditionally approve a preliminary plan if a party of interest announces, at that time, an unwillingness to adopt a record

plat involves the construction of the ordinances administered by the Board. It is an issue that should have been presented for decision by the Board in the first instance. It was not. Therefore, the issue has not been preserved, and we decline to consider it.

### V. Exhibits in Circuit Court

■ CCP complains that the circuit court erroneously admitted the PFP for the project, marked approved on July 8, 2002. The Board counters that the evidence was considered for the limited purpose of demonstrating the date of approval by DPS of the PFP. Because facts occurring after the Board's decision, that render moot the contentions by CCP, may be considered, the Board submits that the evidence was properly admitted. We are at a loss, however, to discern why DPS approval renders CCP's contention moot when that contention is that the Board ought to have decided the setback issue.

Be that as it may, error, if any, in admitting the fact that DPS had approved the PFP is harmless. In Part I, *supra*, we have affirmed the Board for the reasons given by the Board and on the record before the Board. The action later taken by DPS had and has no bearing on the Board's decision to condition preliminary plan approval on DPS approval of the PFP. Whether DPS ultimately approved or disapproved the PFP would not alter the Board's decision.

Whether the circuit court was in any way influenced by admitting in evidence the fact of approval by DPS also is immaterial to our affirmance, inasmuch as we review the action of the agency and not that of the circuit court.

For all the foregoing reasons, we shall affirm.[4]

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED.**

**COSTS TO BE PAID BY THE APPELLANT AND CROSS–APPELLEE.**

---

4. Consequently, it is unnecessary to consider the Board's cross-appeal.