82 A.3d 1227

**Albert ARKING, et al.**

v.

**MONTGOMERY COUNTY PLANNING BOARD, et al.**

**No. 2346, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

Nov. 20, 2013.

Reconsideration Denied Feb. 4, 2014.

Albert Arking, Potomac, MD, pro se.

Carol S. Rubin, Adrian Gardner (Maryland National Park & Planning Commission), Silver Spring, MD, for appellee.

Panel: WOODWARD, GRAEFF, JAMES A. KENNEY, III (Retired, Specially Assigned), JJ.

WOODWARD, J.

The instant administrative appeal comes before this Court following the decision of the Montgomery County Planning Board ("the Board"), appellee, to approve a preliminary plan for resubdivision of property on Gainsborough Road over the objection of Albert Arking and other homeowners in the existing neighborhood, appellants. Following a public hearing at which both Board staff and appellants presented arguments for and against approval of the plan, the Board issued a written Resolution approving the plan, finding that, in accordance with § 50–29(b)(2) of the Montgomery County Code, the resulting lots would be of the same character as those within the existing neighborhood. After appellants exercised their right to judicial review, the Circuit Court for Montgomery County denied both appellants' petition for judicial review and appellants' motion to supplement the administrative record, and affirmed the Board's approval of the plan of resubdivision.

On appeal to this Court, appellants present four questions for our review, which we have combined into two:

1. Did the circuit court err in denying appellants' Motion to Supplement the Administrative Record?

2. Did the Board err in concluding that the resubdivision proposed in the resubdivision plan complied with Montgomery County Code § 50–29(b)(2)?

Finding no error, we affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

On January 6, 2011, Joav Steinbach,[1] on behalf of the Tamara Corporation ("Tamara"), submitted to the Board Preliminary Plan No. 120110110 for resubdivision of a lot located on Gainsborough Road between Seven Locks Road and Fontaine Street in Montgomery County ("the Plan"). In the Plan, Tamara sought approval for the resubdivision of the then-undeveloped Lot 17, Block B of the Willerburn Acres Subdivision, containing 1.01 acres, into two lots of roughly equal size, known as "Lot 60" and "Lot 61," in order to build two separate single-family houses.

On March 25, 2011, appellants submitted a letter opposing the resubdivision to the Board. After reviewing the Plan, staff members of the Board ("Staff") submitted to the Board on April 22, 2011, a detailed memorandum report reviewing and recommending approval of the Plan.

On May 5, 2011, the Board held a public hearing on the Plan. At the hearing, both Staff and representatives of Tamara presented evidence in support of the approval of the Plan. Appellants offered their own testimony and evidence in opposition to the Plan. At the close of the hearing, the Board voted 3–0 in favor of approving the Plan.[2]

Following the hearing, on May 19, 2011, appellants submitted a Petition for Reconsideration by letter to the Board.[3] The letter voiced appellants' disapproval of the Board's May 5

---

1. Steinbach participated at the Board hearing and in the circuit court proceedings, but did not file a brief in the instant appeal.

2. The Board's approval was subject to certain conditions not relevant to the instant appeal.

3. Appellants' Petition for Reconsideration does not appear in the record before us.

decision and also included supplemental materials from other resubdivision plans considered previously by the Board. The Board denied appellants' petition. On May 25, 2011, the Board issued its final Resolution, in which the Board stated in writing its approval of the Plan and explained the reasoning for its decision. In its Resolution, the Board found, in pertinent part:

In accordance with Section 50–29(b)(2) of the [Montgomery] County Code, the proposed lots are of the same character as to street frontage, alignment, size, shape, width, area and suitability for residential use as to other lots within the existing neighborhood (as delineated by Staff in the Staff Report) ("Neighborhood"). . . .

The Resolution concluded by informing all parties that they had thirty days in which to file a petition for judicial review.

On June 21, 2011, appellants filed a petition for judicial review in the circuit court. On July 22, 2011, appellants moved to stay the Board's decision pending judicial review, but the court denied their request on September 13, 2011, following a hearing held on the same day. On September 21, 2011, appellants filed a memorandum of law, along with several attachments, in support of their petition for judicial review.

On October 27, 2011, the Board filed a memorandum in response to appellants' memorandum. Also on October 27, the Board filed a motion to strike, asserting that appellants provided numerous materials to the circuit court, "contrary to the Maryland Rules of Procedure," that were not before the Board at the time it approved the Plan. On November 10, 2011, appellants filed an opposition to the motion to strike and a Motion to Supplement the Administrative Record, in the latter of which they sought to include in the administrative record materials that they submitted to the Board with their May 19 Petition for Reconsideration. The Board opposed the motion to supplement, arguing that the materials were not provided to the Board prior to its May 5 decision and, therefore, could not have been a basis for that decision.

At a hearing on December 1, 2011, the circuit court heard argument from the parties on the Board's motion to strike,

appellants' motion to supplement, and appellants' petition for judicial review. The court, after reviewing the parties' written memoranda of law and hearing their arguments, denied all of the motions [4] and affirmed the Board's approval of the Plan.

Appellants timely filed a notice of appeal. Additional facts will be set forth below as necessary to resolve the questions presented.

## DISCUSSION

## I.

### Supplementing the Agency Record

■ Appellants contend that the circuit court erred in denying their Motion to Supplement the Record. Specifically, appellants assert that the court improperly denied their request "to add to the Administrative Record the homeowners' May 19 letter and the Staff reports pertaining to previous resubdivision plans." In support of this argument, appellants claim that they properly submitted the materials to the Board pursuant to its Rules of Procedure. As a result of the court's refusal to supplement the record, appellants conclude that "the [circuit] Court was unable to judge if the Board's judgment was reasonably based on proven facts."

The Board responds that "[m]aterials submitted to the [ ] Board after that agency's decision should not be considered by this Court in reviewing that decision." Pursuant to the Board's Rules of Procedure, the Board argues, "the record of a proceeding is closed when the [ ] Board votes." Therefore, the Board concludes, "[i]f this Court were to consider supplemental materials on which the [ ] Board did not rely, the Court could not determine whether the [ ] Board's decision was a reasonable conclusion based upon the facts in the record."

■ Appellants' issue asks this Court to decide whether the *circuit court*, not the Board, erred by denying their motion to

---

4. The Board docs not challenge the circuit court's denial of its motion to strike.

supplement the agency record before the circuit court. In judicial review of administrative proceedings, "[a]dditional evidence in support of or against the agency's decision is *not* allowed unless permitted by law." Md. Rule 7–208(d) (emphasis added). It is clear in the instant case that supplementing an administrative record is not permitted by law. Pursuant to the Maryland Administrative Procedure Act, Md. Code (1984, 2009 Repl. Vol.), § 10–222 of the State Government Article ("SG"), a reviewing court may only

(1) remand the case for further proceedings;

(2) affirm the final decision; or

(3) reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision:

(i) is unconstitutional;

(ii) exceeds the statutory authority or jurisdiction of the final decision maker;

(iii) results from an unlawful procedure;

(iv) is affected by any other error of law;

(v) is unsupported by competent, material, and substantial evidence **in light of the entire record as submitted;** or

(vi) is arbitrary and capricious.

SG § 10–222(h) (emphasis added). It is clear from the above language that we are limited to reviewing "the entire record *as submitted.*" SG § 10–222(h)(3)(v) (emphasis added); *see also Capital Commercial Properties, Inc. v. Montgomery County Planning Board,* 158 Md.App. 88, 96, 854 A.2d 283 (2004) ("[A]ppellate review of administrative decisions is limited to those issues and concerns raised before the administrative agency.") The underlying rationale for this principle is as follows:

"'A reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action.' We do not allow issues to

be raised for the first time in actions for judicial review of administrative agency orders entered in contested cases because to do so would allow the court to resolve matters *ab initio* that have been committed to the jurisdiction and expertise of the agency."

*Capital Commercial Properties, Inc.*, 158 Md.App. at 96–97, 854 A.2d 283 (quoting *Delmarva Power & Light Co. v. Public Service Comm'n of Md.*, 370 Md. 1, 32, 803 A.2d 460 (2002)). Because the materials submitted to the circuit court with appellants' motion to supplement were not part of the record before the Board when it rendered its decision, neither the circuit court nor this Court has authority to review them.[5] Therefore, the circuit court did not err.

## II.

### The Board's Decision

The Montgomery County Planning Board is "responsible for planning, platting, and zoning functions primarily local in

---

5. Even assuming, for the sake of argument only, that appellants challenged the *Board's* decision not to consider the supplemental materials—rather than the *circuit court's* decision not consider those materials—we would reach the same outcome.

Appellants argue that their May 19 letter and materials should have been included as part of the administrative record, because the letter specified errors of fact pertinent to their Petition for Reconsideration. Appellants cite no authority, however, permitting the Board to re-open the record based on a reconsideration petition. Indeed, the Board's Rules of Procedure, which became effective January 26, 2007 and apply to "any . . . Preliminary Plan (of Subdivision or Re-subdivision)," provide that after the Board's vote, *"the record of proceedings held before the Planning Board shall be closed."* Montgomery Cnty, Md., Planning Board Rules of Procedure, §§ 1.3, 2.2.3(b), 4.11.2 (emphasis added). Thus, once the Board approved the Plan on May 5, 2011, which was two weeks prior to appellants' motion being filed, the Board's rules mandated that the record be closed.

In addition, appellants take issue with the fact that the Board's Resolution, which was adopted after its vote to approve the Plan, was included as part of the administrative record. The Board's Rules of Procedure plainly state that "[t]he adoption of a Resolution *does not re-open the record of proceedings*[.]" *Id.* at § 4.11.3 (emphasis added). Therefore, we see no unlawful procedures engaged in by the Board. *See* SG § 10–222(h)(3)(iii).

scope," and has exclusive jurisdiction over "the administration of subdivision regulations." Md. Code (2009, 2010 Repl. Vol.) Art. 28, § 7–111(a); [6] *see also* Montgomery County Code ("MCC") (1994), § 50–4 (explaining that Chapter 50 of the County Code "shall be administered by the county planning board"). " 'Subdivision' means the division of a lot, tract, or parcel of land into two or more lots ... for the purpose, whether immediate or future, of sale or building development, and includes re subdivision." Md.Code Art. 28, § 7–101(d). A "resubdivision" is "[a] change in any lot line of a recorded lot or parcel of land. Resubdivision includes the assembly of recorded lots or parts of lots." MCC § 50–1. The design of lots in a resubdivision is governed by MCC § 50–29(b)(2), which states:

> **Lots on a plat for the resubdivision** of any lot, tract or other parcel of land that is a part of an existing subdivision previously recorded in a plat book **shall be of the same character as to street frontage, alignment, size, shape, width, area and suitability for residential use as other lots within the existing block, neighborhood or subdivision.**

*Id.* (emphasis added).

Appellants contend that the Board's decision to approve the Plan was erroneous, for two reasons: (1) the Board did not appropriately select the "existing neighborhood" for the sake of comparing the lots proposed in the Plan; and (2) the Board improperly found that the lots that would result if the Plan were approved would be of the "same character" as the lots in that existing neighborhood. We will discuss each of these contentions in turn.

---

6. Maryland Code Art. 28, § 7–101 *et seq.*, the statutory provisions governing county planning board consideration of subdivisions and resubdivisions of real property, have since been reorganized and recodified, effective October 1, 2012, as Maryland Code (2012), § 1–101 et seq. of the Land Use Article. Because the Board's decision from which the instant appeal arises was decided under the earlier statutory scheme, we will cite to that scheme for the sake of clarity.

## A. Standard of Review

"On appellate review of the decision of an administrative agency, this Court reviews the agency's decision, not the circuit court's decision." *Halici v. City of Gaithersburg,* 180 Md.App. 238, 248, 949 A.2d 85 *cert. denied,* 406 Md. 113, 956 A.2d 202 (2008). As the Court of Appeals has explained:

"A court's role in reviewing an administrative agency adjudicatory decision is narrow; it is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law.

In applying the substantial evidence test, a reviewing court decides whether a reasoning mind reasonably could have reached the factual conclusion the agency reached. A reviewing court should defer to the agency's fact-finding and drawing of inferences if they are supported by the record. A reviewing court must review the agency's decision in the light most favorable to it; ... the agency's decision is *prima facie* correct and presumed valid, and ... it is the agency's province to resolve conflicting evidence and to draw inferences from that evidence."

*Pautsch v. Md. Real Estate Comm'n,* 423 Md. 229, 253, 31 A.3d 489 (2011) (alterations in original) (quoting *Maryland Aviation Admin. v. Noland,* 386 Md. 556, 571, 873 A.2d 1145 (2005)). In short, in applying the substantial evidence standard, "[t]he test is reasonableness, not rightness." *Alviani v. Dixon,* 365 Md. 95, 108, 775 A.2d 1234 (2001) (citation omitted).

Conversely, with regard to an agency's legal conclusions, "no deference is given to a decision based solely on an error of law." *Lee v. Maryland Nat'l Capital Park and Planning Comm'n,* 107 Md.App. 486, 492, 668 A.2d 980 (1995), *cert. denied,* 343 Md. 333, 681 A.2d 69 (1996). Nevertheless,

"with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency. Thus, an administrative agency's interpretation

and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts. Furthermore, the expertise of the agency in its own field should be respected."

*Pautsch,* 423 Md. at 253, 31 A.3d 489 (quoting *Noland,* 386 Md. at 572, 873 A.2d 1145). To that end, "courts give special weight to an agency's interpretation of its own regulations." *Dep't of Health & Mental Hygiene v. Riverview Nursing Ctr., Inc.,* 104 Md.App. 593, 602, 657 A.2d 372 (1995).

### B. Existing Neighborhood

#### 1. Legal Interpretation

■ As the Board notes in its Resolution, it used "the existing neighborhood [ ]as delineated by Staff in the Staff Report[ ]" in reviewing the Plan. The Staff Report stated as follows:

Neighborhood Delineation

In administering Section 50–29(b)(2) of the Subdivision Regulations, the Planning Board must determine the appropriate "Neighborhood" for evaluating the application. In this instance, the Neighborhood agreed upon by the Applicant and Staff, consists of 54 lots [ ]. The Neighborhood includes all lots with frontage on Gainsborough Road between Seven Locks Road and Fontaine Street. This Neighborhood is consistent with the Neighborhoods accepted by the Planning Board for two other resubdivision application reviews on the same segment of Gainsborough.... The designated neighborhood provides an adequate sample of the lot and development pattern of the area.[7]

As appellants acknowledge, "Montgomery County Code provides no guideline on what constitutes the 'neighborhood' that is to be used as the basis for determining if the lots in a proposed resubdivision ha[ve] the same character as the existing lots." Appellants contend, nevertheless, that the Board

---

7. A copy of the diagram depicting the "existing neighborhood" is attached to this opinion as Appendix A.

erred in defining the neighborhood that it used for the proposed resubdivision. Specifically, appellants claim that "the Board accepted without question the neighborhood proposed by Staff, which consists of lots from two sections of Willerburn Acres … that differ in their character and history." Appellants assert that "the two sections differ widely in character," because "Section 1 has much larger lots and more trees, wider frontage, and houses set further back," and because "Section 2 has a curb, but Section 1 does not." Instead, appellants conclude, the Board should have only defined the neighborhood as Section 1.

In response, the Board asserts that, "[a]s the regulatory agency tasked with applying the Subdivision Regulations," it "has substantial discretion to delineate the 'existing neighborhood'" and "must be afforded deference when determining the appropriate standards to review preliminary plan applications for conformance to § 50–29(b)(2)." The Board contends that "[i]n the absence of a specific statutory definition of 'existing block, neighborhood or subdivision,' the [ ] Board reasonably interpreted the law as requiring an impact-based test[,]" under which the "existing neighborhood" includes "those lots that would be most directly affected by approval of the proposed re subdivision." In other words, when establishing the boundaries of a neighborhood, the Board "considers abutting properties, access to and from the proposed lots, and the consistency of the zoning within the defined boundary."

In *Burgess v. 103–29 Ltd. Partnership,* the appellants challenged a hearing board's decision in a zoning case on the issue of whether the board erroneously defined the "neighborhood" of the subject property for purposes of evaluating whether the appellants could obtain a zoning change based on changed conditions in that neighborhood. 123 Md.App. 293, 296–97, 718 A.2d 613, *cert. denied,* 352 Md. 335, 722 A.2d 63 (1998). Collecting Maryland cases on the subject, we explained:

The area constituting the neighborhood of a subject property for the purpose of evaluating change will depend upon the facts and circumstances of each case. The concept of a neighborhood is a flexible one and will vary according to the

geographical location involved; it being axiomatic that in rural or semi-rural areas ... the neighborhood will be larger and more fluid than in a city or a suburban area. A neighborhood should not be precisely and rigidly defined, but may vary from case to case.... Nevertheless, **the neighborhood in any area must be an area which** *reasonably* **constitutes the immediate environs of the subject property. As long as the neighborhood delineated by the zoning authority is reasonable, we must give the greatest deference to the zoning authority's judgment regarding the scope of the neighborhood to be drawn.**

*Id.* at 299–300, 718 A.2d 613 (bolded emphasis added) (internal citations and quotation marks omitted).

 Although *Burgess* was a zoning case,[8] we find the above quoted language instructive in the instant case. Moreover, the absence of a specific definition of "existing [ ] neighborhood" contained within MCC § 50–29(b)(2), or as construed by courts, we give "special weight" to the agency's (*i.e.*, the Board's) interpretation. *Dep't of Health & Mental Hygiene*, 104 Md.App. at 602, 657 A.2d 372. Therefore, we hold that the Board's interpretation of "existing neighborhood" must be reasonable, giving special weight to the Board's interpretation. Because, in determining the "existing neighborhood," the Board considers abutting properties, the access points to and from the proposed lots, and the consistency of the zoning within the defined boundary, we conclude that the Board's standard is reasonable. Thus the Board did not err, as a matter of law, in adopting such standard in the instant case.

---

**8.** It is true that, in general, "zoning and subdivision are normally separate and distinct regulatory entities." *Remes v. Montgomery County*, 387 Md. 52, 64 n. 8, 874 A.2d 470 (2005) (citing *Friends of the Ridge v. Baltimore Gas & Elec. Co.*, 352 Md. 645, 649 n. 4, 724 A.2d 34 (1999)). This distinction stems, in large part, from the fact that zoning "affects the uses to which [lots] may be put," whereas subdivision affects the "formal dimensions" of those lots. *Remes*, 387 Md. at 81, 874 A.2d 470. Nevertheless, both zoning and subdivision (and, therefore, resubdivision) decisions are predicated on the delineation of the existing neighborhood, independent of their doctrinal differences.

## 2. Substantial Evidence

■ Appellants argue that there was not substantial evidence to support the Board's delineation of the existing neighborhood under the Board's standard. According to appellants, the Staff Report contained two critical pieces of erroneous information regarding the "existing neighborhood" chosen by the Board as a predicate to reviewing the Plan. First, appellants argue, "[Staff member] Weaver misinformed the Board when he stated that the subject lot is in a transition area between the two sections," because "the transition [area] is entirely within Section 2." Second, appellants claim, the Staff Report erroneously stated that the chosen neighborhood "is consistent with the Neighborhoods accepted by the Board for *two other* resubdivision application reviews on the same segment of Gainsborough," (emphasis added) when, in fact, there was only *one* prior resubdivision application that defined the Neighborhood in that manner. Furthermore, appellants note, the Staff "failed to mention that there are four other cases where Staff did **not** extend the neighborhood into Section 2, and in two of them Staff rejected the request by the applicant to so extend the neighborhood." (Emphasis in original).

The Board responds that there was substantial evidence to support its decision to utilize Sections 1 and 2 as the "existing neighborhood." First, with regard to the "transition area" complaint, the Board states that the Staff "was merely pointing out that the relevant stretch of Gainsborough Road created a transition between the two defined sections of the Willerburn Acres subdivision," and that appellants' claim amounts to nothing more than disagreement with the Board's view that "the [r]esubdivision will impact both Sections One and Two of the Willerburn Acres subdivision." Second, the Board responds, "[a]lthough there was at least one prior example of a resubdivision in which only Section One was delineated as the 'existing neighborhood,' [S]taff did not bring it to the [ ] Board's attention because it was not material to the case before [it]." Moreover, the Board states, it is not bound by the "existing neighborhood" delineation from previous applications involving nearby lots.

Even accepting, for the sake of argument only, appellants' claim that the Board's "existing neighborhood" was only used on one previous occasion, rather than two, there is substantial evidence in the record to support the Board's delineation of the neighborhood.[9] As the Staff Report explained, the delineated 54-lot neighborhood "includes all lots with frontage on Gainsborough Road between Seven Locks Road and Fontaine Street." Because the lots that would result from the Plan being approved are located on Gainsborough Road between Seven Locks Road and Fontaine Street, it is clear that all of the "abutting properties" were included in the "existing neighborhood." Moreover, the only access points to the proposed lots, as well as to the abutting properties, are from Seven Locks Road and Fontaine Street. Finally, the Board's delineation of the "existing neighborhood" is supported by the Staff's substantial experience with resubdivision in Willerburn Acres.

As we have said,

[W]hen the landowners present one definition of the neighborhood and the planning commission presents another, there exists "an honest dispute as to what comprises the neighborhood mak[ing] the issue fairly debatable, . . . [such that] the city's choice to accept [one] definition cannot successfully be questioned. . . ."

*Burgess,* 123 Md.App. at 301, 718 A.2d 613 (alterations in original) (quoting *Rockville v. Stone,* 271 Md. 655, 661, 319 A.2d 536 (1974)). In the instant case, as in *Burgess,* there were differing definitions of the neighborhood offered by the landowners (*i.e.,* appellants) on one hand and the "planning commission" (*i.e.,* the Board) on the other hand. In such a situation, the delineation of neighborhood is "fairly debatable;" as a result, the Board's resolution is a reasonable one. *Id.;*

---

9. Indeed, we would reach the same outcome even if there were no prior instances of the Board having delineated the existing neighborhood as it did, because, as the Board correctly explains in its brief, it is not bound by the "existing neighborhood" delineation from previous applications involving nearby lots.

*see also Alviani,* 365 Md. at 108, 775 A.2d 1234 ("The test is reasonableness, not rightness.") (citation omitted). Accordingly we conclude that there is substantial evidence supporting the Board's delineation of the "existing neighborhood."

## C. Same Character

As discussed above, when evaluating a proposed resubdivision plan's compliance with MCC § 50–29(b)(2), the Board must make findings that the plan complies with *seven criteria. Lee,* 107 Md.App. at 495, 668 A.2d 980. Here, however, appellants concede in their brief that "[t]he three qualitative criteria (alignment, shape, and suitability for residential use) *are not* in issue." (Emphasis added). Therefore, we limit our review to the Board's consideration of the four so-called "quantitative criteria"—namely, 1) size, 2) width, 3) street frontage, and 4) area.

### 1. Legal Interpretation

Appellants contend that, even if the neighborhood chosen by the Board was not erroneous, the Board erred in determining that the proposed lots are of the same character as the neighborhood. Relying exclusively on this Court's opinion in *Lee,* appellants assert that "[f]or a lot to be of the same character as the other lots in the neighborhood, there must be a *high correlation* with respect to each of the quantitative criteria set forth in § 50–29(b)(2) of the Montgomery County Code." (Emphasis added). Appellants argue that "high correlation" should be defined to mean "somewhere around the median, not near either end of the range." In addition, appellants contend that the Board should be required to "divide the lots into three equal groups: the lowest third, the middle third, and the highest third. *High correlation would then require that the value be in the middle third with respect to each criterion."* (Emphasis added). Appellants conclude that the Board's failure to adopt this process renders its interpretation of MCC § 50–29(b)(2) erroneous.

The Board disagrees with appellants' proposed interpretation of the "high correlation" standard set forth in *Lee.*

Because "[t]his Court must afford the [ ] Board deference in its administration of regulatory tests derived from [the Subdivision Regulations]," the Board contends that under the "high correlation" standard, "each relevant characteristic of a resubdivided lot must conform to, or fall *within the range* for that characteristic of the delineated neighborhood's lots." (Emphasis added).

As this Court explained in *Lee,* "[t]he term 'character' is not defined in the Montgomery County Code, nor has the word been interpreted by Maryland courts as it relates to the Montgomery County Code." 107 Md.App. at 494, 668 A.2d 980 (footnote omitted). Applying the general principle that "we assume that the words used have their ordinary and natural meaning" when interpreting a statute, we relied upon a dictionary definition of "character" for illumination. *See id.* " 'Character,' " we said, means " 'the aggregate of features and traits that form the apparent individual nature of some person or thing.' " *Id.* (quoting WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY OF THE ENGLISH LANGUAGE 247 (1989)) (emphasis omitted). Thus, we concluded that "[t]he character of a neighborhood [ ] is the aggregate of features and traits that give it its distinctive look and feel." 107 Md.App. at 494, 668 A.2d 980. Specifically, "[a] neighborhood's character is a function of the seven criteria specified in section 50–29(b)(2)." *Id.*

We then explained:

The Board must not just *consider* all seven criteria listed in section 50–29(b)(2) but must find that a proposed re subdivision *complies* with all seven criteria. Compliance with the criteria ensures that the lots will be of the same character as existing lots in the neighborhood, block, or subdivision. **To prove that the seven criteria have been met, lots need not be cookie cutter matches to existing lots in the neighborhood. The correlation, however, between area, size, shape, street frontage, alignment, width, and suitability for residential use of the proposed resubdivided lots and existing lots must be high in order to meet the requirements of section 50–29.**

*Id.* at 495, 668 A.2d 980 (first and second emphases in original).

Although "correlation" is a term of art in the field of statistics, we interpret "correlation" in the context of the instant case to have its common meaning. *See id.* at 494, 668 A.2d 980. "Correlation" is "[a] causal, complementary, parallel, or reciprocal relationship, especially a structural, functional, or qualitative correspondence between two comparable entities." AMERICAN HERITAGE DICTIONARY 411 (4th ed. 2000). Two or more entities have a "parallel" relationship when they have "comparable parts, analogous aspects, or *readily recognized similarities.*" *Id.* at 1274, 668 A.2d 980 (emphasis added). Thus, in the context of MCC § 50–29(b)(2), a resubdivision that has a high correlation to an existing neighborhood is one for which the proposed resubdivided lots have readily recognized similarities to lots in the existing neighborhood.

■ Assuming the conceded correlation as to alignment, shape, and suitability for residential use, and addressing only the four quantitative criteria at issue, we agree with the Board, and hold that "high correlation" exists when all four quantitative criteria of the lots in a proposed resubdivision plan fall *within the range* established by the respective quantitative criteria possessed by the lots within the exiting neighborhood. In reaching this conclusion, we reject appellants' invitation to engraft a "median" requirement onto MCC § 50–29(b)(2), because doing so would impermissibly add language to the regulation. *See Kushell v. Dep't of Natural Resources,* 385 Md. 563, 576, 870 A.2d 186 (2005) (noting that "[a] court may neither add nor delete language so as to reflect intent not evidenced in the plain and unambiguous language" of a statute or regulation) (internal quotation marks omitted). Moreover, we are mindful of the settled principle that we should "give special weight to an agency's interpretation of its own regulations." *Dep't of Health & Mental Hygiene,* 104 Md.App. at 602, 657 A.2d 372. Adopting the Board's position, in our view, ensures that the resulting lots from an approved resubdivision will have readily recognizable similarities to neighboring properties without imposing the type of "cookie cutter" restriction

that the *Lee* Court expressly rejected. *See Lee,* 107 Md.App. at 495, 668 A.2d 980. Accordingly, the Board did not err in its interpretation of the "high correlation" standard set forth in *Lee.*[10]

## 2. Substantial Evidence

■ Appellants contend that the Board's decision is not supported by substantial evidence. Specifically, because the proposed resubdivision lots in the instant appeal are "in the lower third with respect to each of the four quantitative criteria," appellants claim that there is not substantial evidence of a "high correlation" with the existing neighborhood. Appellants thus conclude that upholding the Board's decision "would not be consistent with the intent of Montgomery County Code § 50–29(b)(2) nor with the guidelines of [*Lee* ]."

The Board responds that it "supported its findings for each of the quantitative criteria with substantial evidence." Specifically, the Board contends that it "found that the [r]esubdivision complies with all four of the quantitative criteria, noting that the new lots are within the existing range as to each."

In *Lee,* this Court reversed the Board, in large part because we found that "[m]any of the Board's conclusions were not based on substantial evidence." 107 Md.App. at 498, 668 A.2d 980. In particular, we noted, there was "no information in the record as to the width of any of the proposed resubdivided lots." *Id.* at 496–97, 668 A.2d 980. With regard to the size of the proposed lots, we disagreed with the Board's finding that the six proposed resubdivided lots were of the same character as the fourteen existing lots in the neighborhood, because "at least two of the lots are smaller than any other lot." *Id.* at 498, 668 A.2d 980. On the issue of frontage, we again conclud-

---

**10.** Appellants further argue that the Board's decision was erroneous because it failed to use either "correlation" or "high correlation" language in reaching its decision. Appellants fail to provide any legal authority requiring the Board to use specific language beyond evaluating the seven factors set forth in § 50–29(b). Thus contrary to appellants' argument, there is no requirement under Maryland law that the Board use terms like "correlation" or "high correlation."

ed that the Board erred, because there was no information in the record about the length of frontage of the existing lots or three of the six proposed lots. *Id.* at 499, 668 A.2d 980. Moreover, the three lots for which length of the frontage was clear "had no street frontage on existing streets," and thus, we reasoned, "clearly do not meet the street frontage criteria." [11] *Id.*

The case before us is plainly distinguishable from *Lee* on its facts. First of all, the Staff Report contains a five-page "Comparable Lot Data Table" containing precise numerical data concerning all of the seven statutory criteria for each of the existing 54 lots, as well as the two proposed re subdivided lots. In contrast to *Lee,* the Board *did* consider, and presented specific quantitative information concerning the size, width, frontage, and area of the proposed lots, as follows:

Size: The lot sizes are in character with the size of existing lots in the neighborhood. **The range of Neighborhood lot sizes are [sic] from 9,783 square feet to 54,673 square feet. The lots are at 24,011 square feet for Lot 60 and 20,118 square feet for Lot 61 and within the range of all lot sizes.**

Width: The lots will be in character with existing lots in the Neighborhood with respect to width. The two lots will be subject to an established building line (EBL) at the time of building permit. The Applicant has calculated the proposed EBL and measured the lot width at that point. **The width of Lot 60 will be 108 feet and the width of Lot 61 will be 99 feet. The lot widths in the Neighborhood range from 82 feet to 203 feet. The lots are within the range of overall lot widths.**

Frontage: The lots will be of the same character as existing lots in the Neighborhood with respect to lot frontage. **The**

---

11. The *Lee* Court did not discuss the area criterion in reviewing the record, beyond noting that "the Board found that all six lots were of the same character as to size and area as the lots in the designated neighborhood." *Lee v. Maryland Nat'l Capital Park and Planning Comm'n,* 107 Md.App. 486, 498, 668 A.2d 980 (1995).

lots have frontages of 101 feet and 96 feet for proposed lots 60 and 61, respectively. There is a wide range of frontage widths for the existing lots in the Neighborhood from 25 feet to 204 feet. The lots fit into the middle of this range.

Area: The lots will be of the same character as other lots in the Neighborhood with respect to buildable area. The building envelope "area" for the lots in the Neighborhood range from 3,437 square feet to 38,736 square feet. Lot 60 and 61 will have buildable areas of 9,454 and 7,604 respectively.[12]

Therefore, it is clear that the Board applied the "within the range" legal standard to the proposed lots in the instant case, and that there was substantial evidence to support the Board's findings that the proposed lots fit within the range of the size, width, frontage, and area of all the lots in the existing neighborhood. Accordingly, we shall uphold the Board's decision and thus affirm the judgment of the circuit court.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED; APPELLANTS TO PAY COSTS.**

---

12. The Board further analyzed the alignment, shape, and suitability for residential use of the proposed lots and found that the proposed lots were of the same character as existing lots with regard to these "qualitative" criteria. As discussed previously, however, appellants do not challenge these findings of the Board.

*Appendix A.* The Existing Neighborhood (outlined area).